## WRIGHT et al. v. CITY OF CORAL GABLES, FLA.

### No. 10605.

Circuit Court of Appeals, Fifth Circuit.

July 9, 1943.

Rehearing Denied Aug. 12, 1943.

See, also, In re City of Coral Gables, D.C., 1 F.R.D. 600.

F. A. Berry, of Nashville, Tenn., Miller Walton and S. O. Carson, both of Miami, Fla., and Stuart B. Warren, of St. Petersburg, Fla., for appellants.

Morton B. Adams, D. H. Redfearn, and Ira C. Haycock, all of Miami, Fla., for appellee.

Joseph P. Lea, Jr., of Orlando, Fla., amicus curiæ.

Before HUTCHESON, HOLMES, and WALLER, Circuit Judges.

HUTCHESON, Circuit Judge.

Proceeding under the authority of city ordinance No. 347, adopted March 5, 1940, authorizing its filing, the city on June 27, 1940, filed a petition in municipal bankruptcy for the avowed purpose of compelling acceptance by a few creditors who had not accepted it, and had not been settled with, of a plan which the city by ordinance No. 269 on December 23, 1936, had offered to all its creditors as a voluntary plan, and which had been carried to completion as such in 1937 by the acceptance of more than the 90 percent the plan required to make it effective.

The claim of the city was that in filing the petition in 1940, the city was but endeavoring to complete the partially completed plan of 1937, and that under the authority of Sec. 83, sub. j. of the Municipal Bankruptcy Act, 11 U.S.C.A § 403, sub. j,[1] as construed in American National Bank v. City of Sanford, 5 Cir., 112 F.2d 435, and Davis v. City of Homestead, 5 Cir., 112 F.2d 438, the city had the right upon the basis of consents procured in 1940 from

---

[1] "The partial completion or execution of any plan of composition as outlined in any petition filed under the terms of this act (title) by the exchange of new

the holders of its refunding bonds issued and accepted in 1937 under the voluntary plan to compel nonconsenting creditors to accept the plan now for then. On June 27th, there were findings, that the petition complied with the act of congress as amended and that it had been filed in good faith, and orders, that the petition be filed, that a hearing be had on the matters it presented, and that the plan be made temporarily operative.

Two creditors, and only two, made substantial and persistent objection. These were Ed C. Wright & Co., a holder of unrefunded bonds, and the American National Bank of Nashville, Tennessee, a creditor of Wright & Co. and the pledgee, by an arrangement made just before the filing of the plan with knowledge that it would be filed and for the purpose of defeating it, of coupons in the amount of $84,852.50, then detached from bonds of Wright & Co. theretofore held in pledge but then delivered to it. Wright & Co. resisted the approval of the plan on several grounds. One was that the petition for composition was not filed in good faith and for the purpose of rescuing the city from an insolvent condition existing when the petition was filed, but merely for the purpose of arbitrarily forcing it to agree to the voluntary plan long since completed and abandoned. Another was that the consents of the holders of refunding bonds could not within the language and purpose of subdivision (j) be properly used against it because the plan under which they hold their bonds was not a partially but a fully completed one. A third was that the consents were obtained and given under representations which deprive them of the character of the good faith assents required under the bankruptcy statute. Instead of the consents being procured and given because of the city's then insolvency or inability to meet its indebtedness and pursuant to a plan by which those consenting agree in the interest of all to waive or surrender part of their debt or security, these consents were given upon the express assurance of the city that they were but formalities, that their giving would not in any manner affect the rights or interests of those consenting, and that their giving was only for the purpose of forcing the "hold-up" creditors to accept the provisions which the assenting creditors had agreed to under wholly different conditions three years before.[2] While a fourth and fifth were that many of the so-called consenters

evidences of indebtedness under the plan for evidences of indebtedness covered by the plan, whether such partial completion or execution of such plan of composition occurred before or after the filing of said petition, shall not be construed as limiting or prohibiting the effect of this act (title), and the written consent of the holders of any securities outstanding as the result of any such partial completion or execution of any plan of composition shall be included as consenting creditors to such plan of composition in determining the percentage of securities affected by such plan of composition."

[2] On Feb. 24, 1940, the city wrote to each holder of bonds or tax participation certificates taken under the voluntary plan a form letter, advising: "You and others representing 94.18% of the City's obligations consented to the refunding and exchanged your bonds for the new refunding securities. * * * The holders of the remaining 3.98%, $326,000.00, of bonds, have not seen fit to cooperate. The City Commission is not willing to grant to these few non-consenting creditors a better settlement than that which you accepted. Negotiations with these holds-outs having failed to complete the refunding, the City is compelled to avail itself of the Municipal Bankruptcy Act. Municipal bankruptcy proceedings cannot, and will not, change the terms of the refunding bonds or tax participation certificates which you hold. The results will apply only to the unrefunded bonds. * * * We ask that you immediately fill in, execute and return in the preaddressed postal envelope the enclosed preliminary consent and statement upon which the City will prepare and send to you for execution the final consent which will be necessary to enable the City to initiate and support the proceedings. This consent will not obligate you financially in any way and is merely a ratification of your acceptance of the refunding plan." Accompanying this letter was a form of consent which, among other things, provided: "With the understanding that there will be no obligation on my part for the expense of the proceedings and no other financial obligation of any nature and that it will not be necessary to surrender possession of my bonds of the issue of January 1, 1937, I assent to the filing of municipal bankruptcy proceedings as the necessary means of completing the refunding and will sign formal consent thereto when sent to me

were not those who had consented in 1937 but were those who had since purchased the refunding bonds, and that after securing 94 percent of acceptances in 1937, the city had made so many discriminatory settlements that it was impossible to claim that the original plan was now being, or could be, put into effect. The bank made the same objections and the additional objection that the plan was grossly unfair to it because it admittedly offered much more generous treatment of and provision for the principal of the bonded indebtedness than for interest as evidenced by coupons, and the bank held coupons only.

There were a reference to a master, a full hearing by him, a finding that the plan was filed in good faith, was fair and ought to be confirmed, and recommendations accordingly. Exceptions to these findings and recommendations were overruled by the court, and the interlocutory order from which this appeal comes was entered. In it the court, reciting, (1) that as of June 27, 1940, the day the petition was filed, and as of September 22, 1937, the day the plan of settlement was placed in effect by petitioner, the petitioner was insolvent and unable to meet its debts, (2) that the plan was fair, equitable and for the best interests of the creditors and did not discriminate unfairly in favor of any creditor, (3) that it complied with the provisions of law, had been accepted and approved as by law required, (4) that all amounts paid and to be paid by the petitioner for services and expenses in connection with the plan had been fully disclosed and were reasonable, (5) that the offer of the plan and its acceptances were in good faith, (6) that the petitioner was authorized by law to take all necessary action to carry it out, ordered that the plan be approved and confirmed. Among the findings by the master and the district judge were findings that the arrangement for detaching the coupons from the Wright bonds so that the bank could claim to be the holder was made for the purpose of creating a supposed equity in the bank to oppose the plan and not bona fide and in due course of business for the purpose of making the bank the real owner and holder thereof as pledgee.

Wright & Co., the Bank, and one Joseph Lea, who files a brief amicus curiae, but who in the trial below appeared as attorney for Wright, are here insisting that the case does not come within the evil Subdivision (j) sought to remedy, that it does not present a case where that statute can be justly applied. They point out that the voluntary plan had been accepted in 1937 under an express understanding that bankruptcy would not be resorted to, and that after it was completed by securing acceptance of at least 90 percent, the city could then go about making voluntary and preferential settlements with other creditors. They insist that the plan having been fully completed and many voluntary settlements not at all in accordance with the plan having in the three years following been negotiated and concluded, the city may not go through the pretense of filing a petition in bankruptcy for composition of debts when the only purpose and effect of it is to use the statute as a club to compel Wright to take settlements less favorable than those the city accorded to other non-consenting creditors.

■ Of the claim of the bank and the poor mouth it puts up as to its plight in having only coupons and thus being discriminated against in the composition in favor of the holders of the bonds from which the coupons were detached, we make short work. We need only point out, as we did in the case of Roberts,[3] another willing worker for Wright, that proceedings in bankruptcy are ruled by equitable considerations and hard situations deliberately contrived as the result of planning and artifice with Wright for the purpose of blocking by an appeal to the peculiar equity of being an owner of coupons

by the City." (Emphasis supplied.) Attached to the petition were acceptances in which the signer, stating that he was the owner and holder of refunding bonds listed, dated 1-1-37, "said bonds being outstanding as result of the partial completion or execution of the plan of composition evidenced by ordinance 269 * * * which said plan of composition was readopted by ordinance 347, adopted March 5, 1940, as a plan for the com-

position of the debts of the City, hereby accepts and consents to the aforesaid plan of composition to be presented by a petition to the United States District Court for the Southern District of Florida for the completion of said plan for the composition of said debts under the aforesaid plan in accordance with Chapt. IX of the Acts of Congress."

[3] Roberts v. Board of Public Instruction, 5 Cir., 117 F.2d 943, 946.

only, a plan which Wright as owner of the bonds and coupons might not have been able to prevent, would be seen for what it was, not a real but a simulated and synthetic hardship wholly without equitable appeal. In the Roberts case where, detaching coupons from Wright's bonds, Roberts presented the same equity claimed here, we said: "His situation as the result of concert with, and attempted artifice in the interest of, Wright & Company, to block, by appealing to equity, what they could not legally prevent * * *. Proceedings in bankruptcy are ruled by equitable considerations, and the invoked provision of the act, that a plan must not discriminate unfairly in favor of any creditor or claims of creditors, has no application to this case. Compositions of all kinds * * * are grounded on considerations of the purest equity and proceedings under statutes authorizing them have always required openness and fairness of dealing. * * * For a court to give effect to the secret contrivances and arrangements evidently existing here * * * would be to disregard and to do violence to all of these considerations."

The bank, in short, has made its own bed. It must lie in it. If it has fallen into a pit, it is one it has itself digged, and it must, for the court will not aid it, extricate itself therefrom.

▆▆▆▆▆ As to Wright, the matter stands quite differently. Here is no such case as that dealt with in Sanford's case. There there was a plan in the process of completion, and the only objection to the voting of the consents was that some of those consenting had, when they consented, already taken refunding bonds. Here the plan, which it is claimed that the city sought by its petition filed in 1940 to put into effect, was not in any sense a partially completed plan, in addition, it was not the plan proposed in 1937. That plan had been completed, not only in the respect that more than the 90 percent made a prerequisite to its taking effect had accepted and the city had declared it in effect, but in the respect that after 94 percent of the creditors had accepted, the plan was abandoned, and other creditors were dealt with on the basis of voluntary and often quite preferential settlements. It is true that these settlements were not made secretly and that bondholders who had accepted the voluntary plan consented to them. It is true, too, that Wright as to some of his bonds was the beneficiary of one of these settlements. But these facts are without significance here. What is significant is that the city in 1937 completed and thereafter entirely abandoned the voluntary plan it had offered in 1936, and secured the acceptance of in 1937, and that the present proceeding is an entirely new proceeding and in no proper sense a completion of that plan. Of the greatest significance, too, in determining that the plan was not filed in the legal good faith the law requires is the fact that in requesting consents of holders of its refunded securities, the city made it plain that the consents were not requested as a part of a plan, devised to protect the city from its then financial involvements, in the abnegations and sacrifices of which all would share. They were requested and were to be used to bludgeon into submission those with whom the city had not been able to make settlements satisfactory to itself. The statutory provision for municipal composition of indebtedness was not intended to operate in this way. Remedial and beneficial as Subdivision (j) was intended to be, and is, when properly applied, it was not intended to, it could not constitutionally, be applied in the way attempted here, for the result of such application would be to deprive the assents of the constitutional base on which their efficacy as consents rests. That base, as pointed out in Texas Hotel Securities Corp. v. Waco Develop. Co., 5 Cir., 87 F.2d 395, Continental Ins. Co. v. Louisiana Oil & Ref. Corp., 5 Cir., 89 F.2d 333, and In re City of West Palm Beach, 5 Cir., 96 F.2d 85, 86, is the identity of interests of those consenting with those compelled by their consents to accept the plan. That is, that made by persons in the same situation as those against whom their votes are counted, they represent a concession and a yielding on the part of the consenting ones equivalent to that required of those nonassenting but compelled to accept. Nothing in the Sanford case departs from or is in conflict with this view. We there recognized that if the plan had been completed, the city could not have used it merely to put pressure upon those who by the consents of others had become better situated to compel them to surrender the benefits which the prior consentings had conferred. All that was held there was that in respect of a partially executed plan which was still in process of completion, it was competent for Congress to provide that those who had already given their consent could vote, now for then, for the completion

of the plan. We did not, we could not, hold that where, as here, a plan has been entirely completed and it is sought to revive it under changed conditions for the sole purpose of forcibly scaling the debts of nonassenting creditors, the consents of persons holding refunding securities issued under that plan could be solicited and counted as effective consents under subdivision (j). The plan was not submitted in good faith, it is not fair to the opposing creditors, the consents of those who had taken the refunding bonds were not, under the circumstances the record discloses, properly voted in its favor. The order appealed from is, therefore, reversed, and the cause is remanded for further and not inconsistent proceedings.

WALLER, Circuit Judge (concurring in part and dissenting in part).

The case should be reversed and remanded but not for the reasons stated in the main opinion.

The Special Master and the Court below found as a fact that the plan of composition of debts had not been completed when ninety-odd per cent of the bondholders had accepted refunding bonds. I concur.

The fact that the city, through one Excelsen, made a number of special settlements with creditors, some of which held special rights or equities, renders this case difficult. Some of these were judgment creditors who had secured peremptory writs of mandamus requiring ear-marked tax levies for their payment, and on a number of such judgments partial payments had been made.

The plan of the city to make adjustments with funds not devoted to debt service (generally referred to as "free funds") was known and agreed to by the consenting creditors, and became, and was, an integral part of the plan of composition, whereby the city could, and did, prevent the raising of its tax millage to the point of vanishing returns. The creditors who accepted the refunding bonds are not here complaining of the special settlements or the use of the "free funds" in making special settlements. They doubtless recognized that it was for their best interest and the best interest of the city that the judgments and special levies should be eliminated and that judgments and excessive special levies should be prevented in the future. They doubtless realized that if special further Court-ordered and enforced levies were made the rate of taxation would be so high as to prevent property owners from paying their taxes and thereby lessen the ability of the city to keep up its debt service payments, or to accumulate a sinking fund, or to realize anything out of the Tax Participation Fund. They are not before the Court, asserting discrimination, but they *are* interested in seeing the city placed in sound financial position and able to carry out the agreement which they and the city voluntarily entered into.

Believing that the special settlements idea was a material part of the uncompleted plan, I conclude that it could not be dropped from the plan when the city decided to take advantage of Chapter IX of the Bankruptcy Act, 11 U.S.C.A. § 401 et seq., and the procedure under Sec. 83(j) thereof.

If the making of special settlements from "free funds" was a part of the plan before bankruptcy it must still be a part of the plan and the city must, therefore, tender to creditors now as favorable an adjustment as it made to any other creditor, of the same class, in any of its special settlements. In short, if it made a more favorable settlement under the Excelsen plan with bondholder A who held no judgments, writs, special levies, rights, or equities, than the settlement now offered to Wright, the plan before the Court would be unfair to Wright. He, being in the same class as A, would be entitled to the same treatment as was accorded to bondholder A.

Sec. 403, sub. b, 11 U.S.C.A., provides that "The judge shall classify the creditors according to the nature of their respective claims and interests: Provided, however, That the holders of all claims, regardless of the manner in which they are evidenced, which are payable without preference out of funds derived from the same source or sources shall be of one class."

The "nature of the claim" of a judgment creditor who has procured a levy to be made, and who has had dedicated and appropriated to his benefit such a special, ear-marked levy, and who has received partial payments from such ear-marked levy, is not of the same nature as that of a nonjudgment bondholder; and where the judgment creditor is paid off out of "free funds" derived from the sale of city assets he is not paid from "funds derived from the same source" as a bondholder whose claims are payable only from sinking funds derived from general debt service levies and the Tax Participation Fund.

Furthermore, for claims to be in the same class they must be "payable without preference". Under the "first come, first serve" rule in Florida the vigilant creditor who first successfully resorts to mandamus thereby obtains a preference and a priority in available funds. So the judgment creditors, by virtue of their mandamusly-procured ear-marked levies, occupied a preferred status over nonjudgment creditors without special levies, and the two classes of claims are not "payable without preference".

I conclude that although such judgment creditors did not have vested liens, nor vested rights that bankruptcy could not affect, nevertheless, as between them and bondholders who had taken no such steps it appears that: (a) the nature of their claims was different; (b) the source of payment was not the same; (c) they had a preferential right of payment out of the special, ear-marked levies; and (d) they were within the scope of the purpose for which the "free fund" was set up in the plan. From this it seems to follow that such judgment creditors, and those similarly situated, should have been separately classified and dealt with.

Doubtless all other nonassenting creditors could be placed in one other class, where the nature of their claims, their lack of preferential right to payment, and their common source of payment, would be identical, and wherein all in such class should receive the same treatment as accorded any other similar creditor in the settlement of his claims out of the "free funds". Thus Wright would be entitled to receive for his securities as favorable a price as was paid to any other creditor in his class, provided he can be paid out of free funds or out of the sale of assets now held by the city which were acquired by the expenditure of "free funds".

The Court need not concern itself now over special settlements voluntarily accepted by a creditor before the filing of the petition even if a few of such settlements were not as advantageous to the creditor as other settlements made with creditors of the same class, and particularly where such accepting creditor is not complaining.

If the plan was completed in 1937 the Court would be without jurisdiction, otherwise the plan might yet be amended. It seems important, therefore, that the Court should carefully examine, or re-examine, its findings that the plan was fully completed rather than partially completed.

The following considerations seem to sustain the conclusion that the plan was not a fully completed one, or an abandoned one, in 1937, or at any time prior to the filing of the petition herein:

1. Only ninety-odd percent of the bonds were refunded in 1937 and the refunding plan would seem not to have been completed.

2. Negotiations by the city, through Excelsen and others, continued without cessation to the date of the filing of the petition. (Negotiations between the city and Mr. Wright were in progress up to the very time of the filing of the petition in bankruptcy.)

3. The idea of using the "free funds" for the making of special settlements was a part of the plan, known and agreed to by the consenting creditors, and was designed for the purpose of trying to complete the plan, of which the special settlements were a part.

4. The Special Master, after a full hearing of all the facts, found that the plan was not completed prior to the filing of the petition.

5. The District Judge found that it was not a completed plan, and the evidence overwhelmingly supports the findings of the Master and the District Judge to this effect.

6. Counsel for Mr. Wright in at least a dozen places in his brief[4] refers to the voluntary plan as a "partially completed plan" or a "partially executed plan", and I fail to find any earnest contention on the part of counsel that the voluntary plan was a completed one.

I recognize that if the premise of the majority that the voluntary plan was completed before bankruptcy was correct its conclusion would necessarily follow, but since the premise is supported by neither the law nor the facts the conclusion must fall.

If the plan was not completed before bankruptcy, but only partially so, then the lower Court had jurisdiction by virtue of the consents of the bondholders who accepted the refunding plan, particularly when the record wholly fails to show that any of the voting and consenting creditors

---

[4] Pages 2, 8, 13, 14, 15, 17, 18, 21, 22, 24, 32, and 33, brief of counsel for appellant Wright.

received preferential treatment through special settlements. I agree that the plan would be unfair to the nonconsenting creditors if other creditors, *in the same class,* were given more advantageous treatment by special settlements, or otherwise, than is afforded them by the plan under consideration. But if this is the case, the privilege of amendment of the plan should be allowed.

The case should be reversed and remanded with directions to allow amendments so as to: (a) include as an integral part of the whole plan the plan of special settlements; (b) reclassify the creditors in accordance with the views above set out; and (c) afford to the nonconsenting creditors the opportunity to accept a settlement as favorable as the most liberal special settlement heretofore made to any other creditor of the same class.

Rehearing denied; WALLER, C. J., dissenting.