In re WOLF CREEK VALLEY METROPOLITAN DISTRICT NO. IV, Debtor.

Ron B. AULT, Appellant,

v.

EMBLEM CORPORATION, Cyril Wagner, Jr., and Wolf Creek Valley Metropolitan District No. IV, Appellees.

Civ. A. No. 91–K–205.
Bankruptcy No. 90–11906 RJB.

United States District Court,
D. Colorado.

March 18, 1992.

Charles M. Hobbs, Faegre & Benson, Denver, Colo., for Ron B. Ault.

Jack L. Smith, Holland & Hart, Denver, Colo., for Emblem Corp. and Wagner.

## MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

This appeal arises out of the bankruptcy court's confirmation of a Chapter 9 Plan

for Adjustment of Debts for the Wolf Creek Valley Metropolitan District No. 4 (hereinafter, the "District"). The effect of this plan, which was an eleventh-hour amendment of a previous plan, was to discharge all properties from previous years' tax levies, save that of the appellant (Ron B. Ault). In essence, Ault perceives the amended plan as a concoction created for the benefit of one appellee, the Emblem Corporation. On appeal Ault contends that the District and Emblem had knowledge of his ownership of a 41–acre parcel within the District and they both amended the plan, without notice, pursuant to an unauthorized settlement in violation of the Bankruptcy Code, on the eve of confirmation, and solely to deprive Ault of his right to enjoy the property. For these reasons, Ault argues that the bankruptcy court's confirmation of the plan was in error.

## FACTS:

The Wolf Creek Valley area was a white elephant, a prospective development area that never took off, in part due to the collapse of the developers. In order to discharge its own bond indebtedness, the District hiked up taxes and levies to a level which bore no relationship to the value of the properties within it. This ensured that the properties were unsalable and owners were unable to pay the high property taxes. "Facing the prospect of continuing interest accruals and eventual principal maturities on the bonds, the Districts levied taxes in amounts so huge that they effectively made the property within their boundaries unsalable." (R., Ex. 49, Debtor's Memorandum in Support of Confirmation of Plans at 3). The initial Chapter 9 plan proposed by the District was an attempt to rectify this unsatisfactory and circular situation.

In May 1990, Emblem Corporation, a principal debtor of the District, commenced a pre-petition solicitation of creditors with the goal of obtaining a pre-approved Chapter 9 plan for the District. Emblem's desire was to get the Teal Ranch (2,440 acres, the vast majority of land within the District) free of the encumbrances created as a result of the District's having to raise levies to reduce its bond indebtedness. In the pre-petition solicitation, Emblem made clear that the plan would result in its own board of directors being appointed to govern the District. Further, the initial plan contemplated the discharge of all taxes on property within the District's borders.

However, part of the property came into the hands of Ault through the intercession of Schmidt, a friend and former associate of Ault's. Emblem wanted Ault's 41–acre parcel and sought, through its own representative, to purchase the property. Ault refused to sell. Emblem then informed the Board of the District that a condition precedent of its support for the scheme was that the plan be amended and Ault's 41–acre parcel be exempted from beneficial tax relief.

On the day set for the confirmation of the initial plan, October 2, 1990, the District filed two motions to modify its plan to exempt Ault's 41–acre parcel from treatment under the plan. Further, this new plan provided that all outstanding bonds would be transferred to Emblem for no further consideration. As a consequence, Emblem could obtain a tax deed over Ault's property at no further cost, or if Ault paid the taxes, Emblem as holder of the tax certificates would receive $120,262. In addition, under the terms of the deal, to relieve itself of $1,376,629 in taxes, Emblem was only obliged to contribute $260,000 to the plan, an amount it could recoup almost by half on Ault's $120,000 tax liability. Ault asserts that it received no notice of this amended plan. After the amended plan had been confirmed Ault contacted Emblem, which informed Ault that it had unilaterally decided that Ault would not wish to participate in the settlement and consequently had not informed him of the amended plan. By the time Ault had secured counsel, the 10–day appeal for the District's Confirmation Order had expired.

Ault then applied to the bankruptcy court for a Motion to Cure Defects in the Confirmed Plan. In its order confirming the plan, the Bankruptcy Court found that Ault knew that there were unpaid taxes

assessed on the property before his acquisition, that he was fully aware of the District's bankruptcy proceedings before purchasing the property, that he was "gambling on the success of the Chapter 9," (Order at 5), and that he had been constructively notified of the plan through his alternately described "friend," "agent" and "intermediary" Schmidt. Further, the court found that there was no evidence that the District knew of Ault's interest in the property, that there were no legal grounds by which the court could amend the District's plan and that Ault was not a "special taxpayer" entitled to notice. For these reasons the bankruptcy court denied Ault's Motion to Cure Defects in the Confirmed Plan.

### ISSUES:

Pursuant to Bankruptcy Rule 8013, findings of fact on appeal are subject to reversal only if they are clearly erroneous; legal determinations are subject to *de novo* review.

Ault's first contention on appeal is that the amended plan was contrived in violation of due process of law and was void. First, he asserts that he was not given any notice of the change of the plan. Second, he argues that a general awareness of the existence of a bankruptcy proceeding is not sufficient notice to deprive him of his right to be heard on the confirmation of the plan.

Emblem contends in response that the initial notice of the plan to Ault was proper and adequate and that there was no need for special notice of the amendment to the plan because it did not materially affect the plan and creditors benefitting by the plan. Emblem argues that notice to Ault was not necessary because he was not a "party in interest" and did not petition for intervenor status.

In *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950) the Supreme Court stated that: "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality

is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *See also Andrew v. Coopersmith (In re Downtown Inv. Club III)*, 89 B.R. 59, 62–63 (9th Cir.BAP 1988) (judgment void if rendered in a manner inconsistent with due process).

▇▇▇ In a bankruptcy context, a creditor has a right to assume that he will receive adequate notice [1] before his claim is barred. *City of N.Y. v. New York, N.H. & H. R.R. Co.*, 344 U.S. 293, 297, 73 S.Ct. 299, 301, 97 L.Ed. 333 (1953) (a reasonable opportunity to be heard must precede judicial denial of a party's claimed rights). The notice given must not be general, but must be highly specific. *See Owens–Corning Fiberglas Corp. v. Center Wholesale, Inc. (In re Center Wholesale, Inc.)*, 759 F.2d 1440, 1448 (9th Cir.1985); *Credit Alliance Corp. v. Dunning–Ray Ins. Agency, Inc. (In re Blumer)*, 66 B.R. 109, 113–114 (9th Cir.BAP 1986), *aff'd*, 826 F.2d 1069 (9th Cir.1987) (due process requires that individualized notice be given before rights can be affected). Ault, in particular, relies on *Reliable Electric Co. v. Olson Construction Co.*, 726 F.2d 620 (10th Cir.1984). In that case, the court held:

> A fundamental right guaranteed by the Constitution is the opportunity to be heard when a property interest is at stake. Specifically, the reorganization process depends upon all creditors and interested parties being properly notified of all vital steps in the proceeding so they may have the opportunity to protect their interests.

*Id.* at 623; *see also United States v. Security Indus. Bank*, 459 U.S. 70, 75, 103 S.Ct. 407, 410, 74 L.Ed.2d 235 (1982) (bankruptcy proceedings are subject to the fifth amendment); *In re Leading Edge Products, Inc.*, 120 B.R. 616, 619 (Bankr.D.Mass.1990).

▇▇▇ For Ault to be entitled to due process he must establish that he is a party that is protected by the notice require-

---

**1.** Apart from the constitutional requirements of notice, notice is also required by § 102 which is incorporated into Chapter 9 by virtue of § 103(e). *See* 11 U.S.C. § 103(e).

ments. First, he must have a protected property interest which would be affected by the outcome of the proceedings. Emblem contends that Ault was merely "gambling on the possibility that his property taxes might be extinguished by the Debtor's reorganization." (Appellants Br. at 15). Thus Ault's interest, Emblem infers, was not a legitimate claim of entitlement, but only a unilateral expectation of a benefit. *See Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972) (unilateral expectation of a benefit not a protected property interest). This contention can be perfunctorily dismissed. Ault had a very real, tangible claim of entitlement; he was, after all, the owner of a 41–acre parcel of property within the District. Moreover, Ault's property, unlike others similarly situated within the District, was to be exempted from favorable tax treatment, subjecting him to tax liability of $120,262 and consequently a substantial diminution in the value of his investment. Clearly Ault had a protected interest.

 A further prerequisite for due process to be accorded is that Ault must have standing to be heard on plan confirmation. This depends on whether he can be considered a "party in interest." Ault argues that the term "party in interest" has been given a broad interpretation under the Bankruptcy Code and includes more than just creditors. Courts have held that the § 1109(b)[2] list of who may be a party in interest is not exclusive. *See* 11 U.S.C. § 1109(b). "[S]ection 102(3) of the Code, 11 U.S.C. § 102(3) (1982), part of the rules of construction of the Code, states that 'including' is not a limiting term." *In re Amatex Corp.*, 755 F.2d 1034, 1042 (3rd Cir.1985); *see also In re Summit Corp.*, 891 F.2d 1, 5 (1st Cir.1989). Consequently the appearance of the word "including" in § 1109(b) renders the list of who may be a party in interest not exclusive. *See In re Amatex Corp.*, 755 F.2d at 1042; *In re*

*Ionosphere Clubs, Inc.*, 101 B.R. 844, 849–50 (Bankr.S.D.N.Y.1989); *In re Johns-Manville Corp.*, 36 B.R. 743, 748 (Bankr. S.D.N.Y.1984), *aff'd*, 52 B.R. 940 (S.D.N.Y. 1985).

Moreover, it is clear that the legislative history of § 1109(b) indicates that Congress sought to encourage and promote greater participation in reorganization cases. *In re Amatex Corp.*, 755 F.2d at 1042; *In re Keystone Realty Holding Co.*, 117 F.2d 1003, 1005 (3rd Cir.1941) (construing former Bankruptcy Act § 77B); *Chemical Bank v. Slaner (In re Duplan Corp.)*, 450 F.Supp. 790, 791 (S.D.N.Y.1978) (construing § 206 of the Bankruptcy Act); *In re Citizens Loan & Thrift Co.*, 7 B.R. 88, 89–91 (Bankr.N.D.Iowa 1980).

 Nonetheless, although § 1109(b) should be construed broadly; only a party sufficiently affected by a Chapter 9 proceeding should be able to appear and be heard. *See In re Amatex Corp.*, 755 F.2d at 1042–43; *In re Public Serv. Co. of N.H.*, 88 B.R. 546, 551 (Bankr.D.N.H.1988). The critical test is whether the prospective party has a "sufficient stake in the proceeding so as to require representation." *In re Amatex Corp.*, 755 F.2d at 1042; *See also In re River Bend–Oxford Assocs.*, 114 B.R. 111, 113 (Bankr.D.Md.1990) ("Party in interest is an expandable concept depending on the particular factual context in which it is applied. The purpose is to permit the involvement of those persons and interests which will be affected by the reorganization process").

 Courts have looked to the purposes of the Code to determine the limits of the prospective class of parties in interest. Bankruptcy courts were established to provide a forum where creditors and debtors could settle their disputes and thereby effectuate the objectives of the statute. *Roslyn Sav. Bank v. Comcoach Corp. (In re Comcoach Corp.)*, 698 F.2d 571, 573 (2nd Cir.1983). *In re Ionosphere Clubs, Inc.*,

---

**2.** Section 1109(b) applies in Chapter 9 proceedings. *See* 11 U.S.C. § 901. Section 1109(b) reads:

A party in interest, including the debtor, the trustee, a creditors' committee, an equity se-

curity holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter.

101 B.R. at 849; Hence many courts have concluded that "the party requesting standing must either be a creditor of a debtor ... or be able to assert an equitable claim against the estate." *In re Ionosphere Clubs, Inc.*, 101 B.R. at 849.

For example, in *Comcoach*, the court held that a bank-mortgagee on property leased was not a party in interest. A crucial consideration was that the bank had no right to payment from the debtor. In *Greg Restaurant Equipment & Supplies, Inc. v. Tour Train Partnership (In re Tour Train Partnership)*, 15 B.R. 401 (Bankr. D.Vt.1981), a judgment creditor of the debtor's secured creditor was held not to be a "party in interest" because it was not itself a direct creditor of the debtor. In *Ionosphere*, the court held that a consumer organization for airline passengers lacked standing because:

> CU, as an organization, also lacks any right to payment. CU, by its own admission, has not purchased any airline tickets, did not lend any money or assets to the estate, nor does it have an equitable or contingent claim. The reorganization does not affect any vital interest of CU. It has no direct financial relationship to Eastern and has no right to direct reimbursement for airline tickets.

*Id.*, 101 B.R. at 850.

In the present case, however, it is abundantly clear that both "vital interests" of Ault are being affected, and that he has a "sufficient stake" in the Chapter 9 proceeding. After all Ault stands to have his land appropriated by Emblem, or at best he will be subject to $120,262 in assessed taxes from which every other property in Wolf Creek Valley is exempt. The authorities recognize that § 1109(b) can be extended when vital interests are at stake, nor has Emblem cited any case that stands for the proposition that a "non-creditor" or "non-stockholder" entity never has party in interest status under § 1109 of the Bankruptcy Code. It appears that this conclusion would in any case be incorrect. *See e.g., In re Public Serv. Co. of N.H.*, 88 B.R. at 555. In *Public Service*, the court granted party-in-interest status to the non-credi-

tor State of New Hampshire. The court considered the state's statutory basis for involvement in the reorganization, through its authority to approve any rate changes in the debtor's plan of reorganization. It also held that the state was implicated due to questions concerning the debtor's regulatory compliance. *Id; see also Unsecured Creditors Comm. v. Marepcon Fin. Corp. (In re Bumper Sales, Inc.)*, 907 F.2d 1430, 1433 (4th Cir.1990) (§ 1109(b) to be construed broadly, in order to allow Chapter 11 parties to appear and be heard); *In re River Bend–Oxford Assocs.*, 114 B.R. at 115 (recognizing sponsors of a plan submitted to creditors and interest holders as parties in interest).

Crucially, *Commercial Union Insurance Co. v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 31 B.R. 965, 971 (S.D.N.Y.1983), establishes that a consumer union that was a *debtor of a debtor* is a party in interest. Moreover, the court had interesting observations on the ruling in the *Comcoach* case:

> [T]he interest of CU in the litigation is different from that of the bank in *Comcoach*. The bank had no relationship with the debtor-tenant, except for that fortuitous one arising from the debtor's status as tenant of the defaulting mortgagor. Thus the court of appeals could say without hesitation that the bank was neither a *debtor nor a creditor* of the bankrupt.

*Id.* (emphasis added).

In contrast, in *Johns–Manville* a direct relationship between a debtor and a debtor was sufficient for standing purposes. In the present case Ault is, of course, a debtor to the debtor (the District). The court in *Johns–Manville* was also influenced by a factor equally relevant in the present case, that if relief was not granted to the debtor of the debtor, no one could obtain relief on its behalf. *Id.* at 971–72.

In short, it is clear that Ault had a definite relationship and interest in the reorganization. He was a debtor of the District, the Chapter 9 debtor. The function and purpose of the plan of reorganization was to facilitate both the interests of creditors

and other debtors to the District. Thus Ault was a party in interest entitled to object to the confirmation of the plan.

▇ Indeed, in terms of Emblem's logic, Emblem itself would not qualify as a party in interest, despite the fact that the plan was being devised at its behest and for its benefit, as it likewise was a debtor of the debtor.

A further contention of Ault's, however, may be dismissed. Ault asserts that the singling out of his property for specific treatment indicates that a special category was created, Ault's 41–acre parcel. Since the plan treats his property differently, Ault argues that his assessment is "modified under the plan in a different proportion from the assessments or taxes of all other payers of the special tax," 4 Collier on Bankruptcy ¶ 902.03 (L. King 15 ed. 1992). Therefore, he asserts that he is a special taxpayer with standing. The problem with Ault's contention is that, in order to be a special taxpayer he must fulfill two conditions: the tax to which he is subject must be a special assessment or special tax and the proceeds of the tax must be the sole source of payment of an obligation by the debtor to defray the cost of an improvement relating to the property. *See* 11 U.S.C. § 902(3).

Ault's contention that he is a special taxpayer must be dismissed. First, the tax introduced by the District in the first place was a general *ad valorem* tax for the purpose of paying principal of, interest on, and any premiums due on bonds issued by the District. The application of the tax under the amended plan to the appellant may have been unfair, but this does not change the nature of the tax itself, an *ad valorem* tax. Second, even assuming the singling out of Ault for special treatment satisfies the first condition of § 902(3), the tax was not the sole source of repayment of the obligations issued by the District. The record reflects that there were several sources for repayment of the District's bonds:

> The Bonds are general obligations of the Districts, secured by their covenants to levy general ad valorem property taxes ... Other legally available funds or revenues from which the Bonds may be paid include (a) reserve funds which were established from the Bond proceeds and invested in United States Treasury notes or obligations; (b) capitalized interest funds which were funded through a portion of the Bond proceeds; (c) government obligations funds which were established by using some of the Bond proceeds to purchase stripped United States Treasury bonds to be used to secure the payment of principal of the bonds maturing on October 1, 2005; (d) construction funds ... (e) water tap fees ... (f) single-family recreational memberships for District IV pursuant to a Recreational Facilities Fees Agreement with the Developer.

(R., Ex. 12 at 5–6.)

Moreover, the Bankruptcy Court found that "the District also created a Capital Improvement Fund to be used solely to provide capital improvements in the District *and* to pay debt service on its bond obligations." (Order at 6). Accordingly, as the tax to which Ault's property was subject was by no means the sole source for the District to repay its bond indebtedness, Ault cannot be considered a "special taxpayer."

▇ Having established that Ault was entitled to due process and adequate notice as a party in interest, though not as a "special taxpayer," it now remains to be seen whether he did in fact receive such notice. I find that the appellant was not adequately notified. In particular, it is clear that Schmidt, who at one stage acted in tandem with Ault, was no longer in any sense of the word, an "agent" for the appellant at the time that the amended plan was concocted.[3] On August 3, 1990,

---

**3.** A critical part of Ault's case is devoted to establishing that Schmidt was not his agent. In contrast, Emblem endeavors to deny that the bankruptcy court found that Schmidt was an agent in order to circumvent the issue as to whether he was properly qualified to act on Ault's behalf. Instead, Emblem asserts Schmidt was sufficiently notified as a friend or interme-

Schmidt explicitly notified Emblem that he could no longer serve as an "intermediary" between the parties and that Emblem should contact Ault directly. Emblem subsequently contacted Ault directly, who informed it that he would not consider selling the property. It was then, and only then, that the idea of an amended plan began to crystallize and take shape as a means to coerce or override Ault's refusal to sell. Moreover, there was no further contact between Ault and Emblem, or Ault and the District, after this point.

■■■ In short, even if there was an initial agency relationship, at the initial purchase of the 41-acre parcel, when Schmidt acted as the appellant's friend and occasional intermediary, that relationship was clearly terminated on August 3, 1990. A third party has notice of the termination of an agency relationship when he knows, or has been given notification of, an event from which he could reasonably infer that the principal does not consent to have the agent act for him. Restatement (Second) of Agency § 135 (1958). Further, there is no evidence to indicate that Ault was adequately notified of the amended plan as he was entitled to be.

A further consideration is that a plan cannot be confirmed unless it is proposed in good faith and not forbidden by law.[4]

It has long been recognized that one who invokes the protective provision of the bankruptcy laws must do so in order to accomplish and further the expressed legislative aim of the particular Chapter *and not for any other purpose....* There is nothing in the legislative history which would indicate that Congress, by omitting the express requirement of "good faith" intended to do away with

the safeguard against abuse and misuse of the process, a safeguard which has been long established and accepted as part of the bankruptcy philosophy for almost a century. Accordingly good faith must be viewed as an implied prerequisite for a debtor's ability of obtaining relief under this Chapter.

*In re Mogul,* 17 B.R. 680, 681–82 (Bankr. M.D.Fla.1982). (emphasis added).

Good faith requires a full disclosure of all material facts. *See American United Mutual Life Ins. Co. v. City of Avon Park, Florida,* 311 U.S. 138, 144–145, 61 S.Ct. 157, 161, 85 L.Ed. 91 (1940); *Little Creek Development Co. v. Commonwealth Mortgage Corp. (In re Little Creek Development Co.),* 779 F.2d 1068, 1072 (5th Cir. 1986); *see generally* Robert L. Ordin, *The Good Faith Principle in the Bankruptcy Code: A Case Study,* 38 Bus.Law. 1795, (1983).

■■■ When certain bondholders have benefitted disproportionately from the plan, the plan has been condemned as unfairly discriminatory. *American United Mutual Life Ins. Co. v. City of Avon Park Florida,* 311 U.S. at 144–45, 61 S.Ct. at 161; *Town of Belleair v. Groves,* 132 F.2d 542, 542–43 (5th Cir.1942); *Kaufman County Levee Imp. Dist. No. 34 v. Mitchell,* 116 F.2d 959 (5th Cir.1941). It was not good faith "to bludgeon into submission those whom the city had not been able to make settlements satisfactory to itself." *Wright v. City of Coral Gables,* 137 F.2d 192, 195 (5th Cir.1943).

Although there was a pressing necessity to reorganize the finances of the District, that purpose was being adequately accom-

---

diary of Ault's. However, there seems little doubt that the court did in fact establish that Schmidt was an agent for the appellant:
> This court finds that Schmidt was, in fact, during this time, agent for Ault and thus the knowledge of Schmidt and that notice to Schmidt was knowledge and notice of Ault. (Order at 7).

I therefore consider whether Schmidt was an agent of Ault's in relation to the amended plan, without assessing in detail the complexities of information accorded to a "friend" or "intermediary." Moreover, even if Schmidt were still

held to be acting as Ault's agent at the time of the amended plan, there was no evidence that he was notified of the amended plan.

4. Section 943(b)(1) requires as the first condition of confirmation that the plan comply with the provisions of the Bankruptcy Code made applicable by sections 103(a) and 901(a) of the Code. Section 1129(a)(3) is thus made applicable to Chapter 9, that a plan be "proposed in good faith and not by any means forbidden by law."

plished by the first plan. In contrast, the amended plan was proposed by Emblem to induce Ault to give up his property or to make a windfall payment to Emblem. In these circumstances, it is clear that the provisions of Chapter 9 were being used as a device other than for the reorganization of the District's financial affairs.

Moreover, the structure of the plan exemplifies how one-sided its provisions were: Emblem was authorized to designate a board of its appointees to administer and control the District, Emblem was required to pay a mere $260,000 to relieve itself of $1,376,629 in taxes, and Ault was required to pay over $100,000 to relieve himself of $120,262 in taxes. Under the amended plan if Ault did not pay $120,262 to Emblem, Emblem could acquire a tax deed on his property. In short, Emblem's championing of the plan betrays a blind pursuit of self interest. Above all, the complete absence of notice of the amended plan exemplifies the lack of good faith on Emblem's behalf.

■ A final and important issue is that the bankruptcy judge found that he could not amend the plan at this late stage:

> Finally, that Plan has been consummated. The bondholders have been paid and the funds under the Plan have already been distributed. The Court cannot at this late date void the Plan, nor even amend it. For that matter, there is no provision in the Bankruptcy Code to amend a Plan after confirmation in a Chapter 9 case.

(Order at 7–8).

The courts, however, have been mindful of the exceptional nature of Bankruptcy law:

> In a bankruptcy case ... the confirming of a plan of reorganization is in some ways only the beginning of the case. The bankruptcy court generally retains broad jurisdiction over a case even after a plan has been confirmed ... This juris-

diction is necessary to settle disputes concerning the administration of the plan as they arise, and to ensure that changes in the reorganized debtor's financial condition are handled equitably.

*Bill Roderick Distrib., Inc. v. A.J. Mackay Co. (In re A.J. Mackay Co.)*, 50 B.R. 756, 759 (D.Utah 1985).

■ After a plan has been finally confirmed, there is a need for judicial review of potential mistakes.[5] " 'There is practical utility in the application of a rule which permits the vacation or modification of bankruptcy orders where subsequent events presented during administration demonstrate the necessity therefor; and to do so would not be inequitable.' " *Otte v. Manufacturers Hanover Commercial Corp. (In re Texlon Corp.)*, 596 F.2d 1092, 1101 (2d Cir.1979) (citing 7 James W. Moore et al., *Moore's Federal Practice* ¶ 60.18 at 215 (2nd ed. 1985)); *see also In re Marcus Hook Dev. Park, Inc.*, 943 F.2d 261, 265 (3rd Cir.1991); *Carey v. Mobil Oil Corp. (In re Tilco, Inc.)*, 558 F.2d 1369, 1372 (10th Cir.1977); *Matilla v. Radco Merchandising Serv., Inc. (In re Radco Merchandising Serv., Inc.)*, 111 B.R. 684, 689 (N.D.Ill.1990); *Bryant v. Straup (In re Straup)*, 90 B.R. 481, 483 (D.Utah 1988); *In re Tri–L Corp.*, 65 B.R. 774, 778 (D.Utah 1986); *In re A.J. Mackay Co.*, 50 B.R. at 759.

Although finality of judgments is an important value in bankruptcy law, so is correctness. As Judge Learned Hand indicated, there is no reason why a bankruptcy court judgment must be final: "Why it is desirable that their orders, ruat coelum, should be as immutable as the Twelve Tables, once the ink is dry, we cannot understand." *Central Ill. Co. v. Irving Trust Co. (In re Pottasch Bros. Co.)*, 79 F.2d 613, 616 (2nd Cir.1935). Moreover, Article VIII of the plan specifically authorizes the Bankruptcy Court to retain jurisdiction to consider any plan modifications. (R.Doc. 12, Ex.B. at 7).[6] *In American United Life*

---

**5.** This equitable power is derived from § 105(a) which applies to Chapter 9 by virtue of § 103(e).

**6.** Section 945(a) of the Bankruptcy Code provides that "[t]he court may retain jurisdiction over the case for such period of time as is necessary for the successful implementation of the plan."

*Ins. Co. v. Haines City,* 117 F.2d 574 (5th Cir.1941), the court ruled that a confirmed plan was a contract and could be modified by reason of surprise or mistake:

> We are unwilling to put a plan into such a straightjacket. It may be that some matter has been overlooked or has subsequently arisen, which makes the plan unworkable and complicated, but which could easily and justly be remedied. Surprise or mistake may affect it. There ought to be some leeway for such adjustments.

Id. at 576.[7]

■ A critical problem, is, however, the bankruptcy judge's ruling that the plan was not only confirmed but was consummated.[8] I find the factual finding of the bankruptcy judge to be clearly erroneous on this point. An important consideration in determining whether the plan has been consummated is whether the plan, if now modified, would substantially interfere with the rights of creditors or other interested parties, or whether it would only affect relationships between Ault and Emblem. If Ault were to pay his remaining taxes of $120,262 the money will go to Emblem, as all bonds to Ault's property have been transferred to Emblem as a consequence of the amended plan (Docket No. 12 § 5.2). If Ault does not pay his singular taxes, Emblem will, pursuant to its ownership of the bonds be able to acquire a tax deed to Ault's property. The interests of the creditors to the District are not affected by this disputed relationship and it is possible to isolate and amend the interests of Ault and Emblem without infringing on their rights under the plan. Nonetheless, the rights of creditors who have not been adequately informed of the amended plan have also to be considered. In these circumstances the finding of the Bankruptcy Court is reversed and remanded. The Bankruptcy Court may confirm the plan as originally filed without the amendments specific to Ault's property or require a new plan to be submitted and considered at a hearing for which proper notice is given to all parties in interest including Ault.

### CONCLUSIONS:

Emblem has, in concert with the District, violated Ault's due process right as a "party in interest" to adequate notice of the amended plan. Throughout, Emblem acted not for the overall benefit of the reorganization, but to advance its own interests; its actions, therefore, were not done in good faith. Moreover, the only party who would benefit, either by land or money, if this court denied relief is Emblem. Such would not be a fair and just resolution of the dispute. The judgment of the Bankruptcy Judge is REVERSED and the case is REMANDED for additional proceedings.

---

**7.** This case is important in that it was decided under Bankruptcy Act § 83(e), former 11 U.S.C. § 403(e) (1940), the precursor of 11 U.S.C. § 942.

**8.** Even if the administration of the plan has been complete and the consideration under the plan has been distributed, and all claims have been determined, the court can always reopen the case under § 350(b) (11 U.S.C. § 350(b)). This section of the code is made applicable to Chapter 9 by virtue of § 901(a) (11 U.S.C. § 901(a)).