In re MOUNT CARBON METROPOLITAN DISTRICT, a quasi-municipal corporation, EIN 84–0748058, Debtor.

Bankruptcy No. 97–20215 MSK.

United States Bankruptcy Court,
D. Colorado.

Nov. 1, 1999.

---

Holly Holder, Holly I. Holder, P.C., Denver, CO, Brian P. Halloran, Connolly, Halloran & Lofstedt, P.C., Louisville, CO, for debtor.

Mark K. Worcester, Irvine, CA, for CDN Development, L.P.

Raymond Petros, Jr., Gillian Dale, Petros & White, LLC, Denver, CO, Stuart Pack, Charles McVay, Gorsuch Kirgis, LLP, Denver, CO, for the Cities.

Joel Laufer, Holden Padjen & Laufer, LLC, Denver, CO, for the Unsecured Creditors Committee.

Beth Brown, Kelly Calocci, Holme Roberts & Owen, LLP, Denver, CO, for the Indenture Trustee for holders of 1985 District bonds.

## MEMORANDUM OPINION AND ORDER REGARDING CONFIRMATION OF THIRD AMENDED PLAN FOR ADJUSTMENT OF DEBTS

MARCIA S. KRIEGER, Bankruptcy Judge.

THIS MATTER comes before the Court on the request of Mount Carbon Metropolitan District (the District or Debtor) for confirmation of its Third Amended Plan for Adjustment of Debts (Plan). Objections to confirmation were filed by the City of Lakewood, Town of Morrison (collectively the Cities), Westwind Limited Liability Company (Westwind), Michael Blumenthal and Harvey B. Alpert. By Order of July 20, 1999, the objections of Michael

Blumenthal and Harvey B. Alpert were overruled for lack of standing.

At the Confirmation Hearing conducted September 3–10, 1999, the District was represented by Holly Holder of Holly I. Holder, P.C., with regard to water issues, and Brian P. Halloran of Connolly, Halloran & Lofstedt, P.C., with regard to all other issues. The Plan funder, CDN Development, L.P. (CDN), appeared through counsel Mark K. Worcester. The Cities were represented by Raymond Petros, Jr. and Gillian Dale of Petros & White, LLC, with regard to water issues, and Stuart Pack and Charles McVay of Gorsuch Kirgis, LLP, with regard to all other issues. Also appearing were Joel Laufer on behalf of the Unsecured Creditors Committee (Committee) and Beth Brown and Kelly Calocci of Holme Roberts & Owen, LLP for the Indenture Trustee for holders of 1985 District bonds.

## I. JURISDICTION

With regard to confirmation of the District's Plan, this Court's jurisdiction arises pursuant to 28 U.S.C. § 1334(a) and (e). However, it is limited in accordance with 11 U.S.C. § 904. This is a core matter pursuant to 28 U.S.C. § 157(b)(2)(L).

## II. FACTS

### 1. Background

The District consists of approximately 1,000 acres bounded roughly by C–470, Alameda Avenue, Green Mountain subdivision, and Morrison Road in Jefferson County, Colorado. It is characterized by magnificent rolling green hills, breath-taking views of the hogback and Denver metropolitan area and easy accessibility. It is a prime site for development and is almost entirely unimproved.[1]

The District was organized initially as a water and sanitation district in 1976,[2] but became a metropolitan district in 1982. Metropolitan districts are governed, in part, by C.R.S. § 32–1–202, *et seq.*, which requires adoption of a service plan. The District's 1983 Service Plan (Service Plan) expands the District's authority and obligations to include provision of street improvements, safety protection, and park and recreation facilities.[3] These obligations are ongoing and will become more important and costly to perform as the District is developed.

Of 18 landowners in the District, the three most significant for future development[4] are: (1) CDN Development, L.P. (CDN)[5] with approximately 228 acres zoned for residential development (Springfield Green) and approximately 161 acres zoned for commercial development (Red Rocks Centre), (2) Colco Corporation/Yale Investment owning approximately 280 acres zoned for commercial development (Red Rocks Centre and Red Rocks Business Park) and approximately 80 acres zoned for residential and commercial development (Lakewood West), and (3) Westwind Limited Liability Company with approximately 44 acres zoned for residential and commercial development.

---

1. Streets, lights and a storm sewer drainage system have been installed in a small portion of the District, Red Rocks Business Park, but they are in need of inspection, repair and replacement.

2. The purpose for its creation was to provide water supply treatment, storage, a transmission and distribution system and a complete sanitary sewage collection, transmission, treatment and disposal system. (Exhibit 3P, p. 1 to the Plan).

3. *Id.* at 2.

4. All acreage figures are approximate as there are some variations among the numbers in evidence.

5. During the 1990's, CDN acquired this land, as well as certain water and water and sewer tap rights, and 8 promissory notes from the Resolution Trust Corporation (RTC) for a purchase price of approximately $4.3 million. The notes have a face value of approximately $16 million and bear interest at between 10% and 17% per annum.

CDN desires to develop Springfield Green as soon as possible. Such development is contingent upon confirmation of the District's Plan, provision of adequate water, installation of infrastructure and negotiation of a new Public Improvement Agreement (PIA) with Lakewood. Taubman–Mills desires to locate a shopping mall partly within the District, but negotiations for purchase of the site and approval by Lakewood and other entities have not been concluded. Anticipating confirmation of the Plan and an increase in tax assessment, Taubman–Mills desires to purchase an exclusion from the District.

## 2. Water and Infrastructure

The District has historically lacked and currently lacks sufficient water and infrastructure to develop. It holds rights to approximately 400 EQRs [6] of water, but its ability to use such water is limited by the infrastructure in place. The infiltration gallery through which raw water is drawn from Bear Creek does not provide treatment sufficient for residential consumption. The District lacks adequate water storage, and the Morrison wastewater facility, which services the District, lacks sufficient capacity to treat even this volume of waste water, much less a greater volume necessary for development.[7] Two water experts, Dr. Jeris Danielson and Mr. Robert Brogden, agree that even if the District purchases water rights from CDN in accordance with the Plan,[8] it will nevertheless need substantial additional water rights and expanded infrastructure in order to develop in accordance with the District's projections.[9] The experts also agree that water rights for acquisition are not readily available and that acquisition of water rights, expansion of the wastewater treatment capacity [10] and installation of other water and sewer infrastructure will be costly and time consuming. Mr. Brogden did not opine as to the cost or timeline for acquiring the water or for infrastructure development.[11] The Court, therefore, accepts Dr. Danielson's estimate that the cost of water and sewer related infrastructure will be at least $46 million [12] and the time for acquisition of sufficient water rights and installation of appropriate infrastructure will be approximately six to seven years.

## 3. District Financial Resources and Debt

At the time of its filing on July 14, 1997, the District was not providing services in accordance with its 1983 Service Plan and had less than $200.00 in cash.[13] The District's 21.45 mill tax levy generated tax revenues of less than $11,000.00 in 1996 and less than $10,000.00 in 1997. Having no resources with which to fund this case, the District's Chapter 9 expenses are being paid with funds borrowed from CDN.

The District's pre-petition debt totals approximately $58 million (including principal and accrued interest).[14] Of that, ap-

---

6. An EQR is an "equivalent residential tap" or, stated differently, the amount of water needed for one residence.

7. Exhibit 2P.

8. The specific rights are described in the Plan Funder Agreement, Exhibit A to the Plan.

9. The experts disagree on how much more water will be required. Dr. Danielson believes that at least 5000 EQRs are needed; Mr. Brogden believes 3900 EQRs will be sufficient.

10. By contract, the District can obtain wastewater treatment from Morrison, but only if the District pays all of the costs to expand Morrison's existing facility to add the capacity needed by the District.

11. The District's Water and Sewer Plan, attached to Mr. Brogden's report, describes such matters as "unknown."

12. This does not include the estimated cost of additional water rights.

13. District's Motion for Entry of Order for Relief.

14. Exhibit L to the Third Revised Disclosure Statement.

proximately $37 million is owed on promissory notes held by CDN; approximately $13 million is owed on Series 1985 A–1 and A–2 Bonds (secured by Treasury Strips); approximately $6 million is owed on 1991 general obligation bonds; approximately $2 million is owed to other note holders; and approximately $1 million is owed to Citywide Bank (secured by water rights).

### 4. The Plan

The District's Plan was filed on April 1, 1999. The Disclosure Statement in support of the Plan was approved following proper notice. Votes from creditors in impaired classes (1, 4, 5 and 7) were solicited, and such classes accepted the Plan. Class 2, Citywide Bank, and Class 3, CDN, did not vote because such claims were unimpaired. Class 6, executory contract holders, did not vote because the Plan proposes assumption of all executory contracts.

The District's Plan proposes to pay creditors with a combination of cash and Exchange Bonds. The District will issue Exchange Bonds in the face amount of $194 million in four classes: $5 million of Series A; $5 million of Series B; $7 million of Series C; and, $177 million of Series D. Series A Exchange Bonds will bear interest at 6% per year, payable semiannually, for 40 years and beyond if not fully repaid at the end of 40 years. Tax revenues will pay these bonds first. Series A Exchange Bonds are callable at any time. Series B Exchange Bonds bear interest at 7% per year, also payable semiannually, for 40 years or longer. They have second priority for payment from tax revenues and may also be paid with "additional tap revenues."[15] Series B Exchange Bonds are also callable. Series C Exchange Bonds have the same terms as Series B, but are third in priority for payment from tax revenues and may also

be paid with additional tap revenues. Series D Exchange Bonds bear interest at 8% per year, payable semiannually, for 40 years or longer. No principal is expected to be paid until year 38 and they are not callable. They are last in priority for payment from taxes and all other sources of revenue.

The Exchange Bonds will have a lien position senior to all other debt incurred after confirmation. None of the Exchange Bonds have a default provision. If interest is not fully or timely paid, it compounds as principal. If the Exchange Bonds are not paid as the District projects, its debt could increase exponentially over an unlimited time period. The "no default" provision means that the District will technically never be in default in payment of the Exchange Bonds; therefore, it cannot seek future Chapter 9 restructuring due to its failure to pay the Exchange Bonds as projected.

Administrative claims (Class 1), Citywide Bank (Class 2) and the 1985 bond trustee claim (Class 7) will be paid in cash with funds borrowed from CDN. For 1985 bondholders, Treasury Strips worth approximately $2 million securing the 1985 bonds will be liquidated and paid to reduce principal. For the remaining principal amount, bondholders may elect between a cash payment of 33 1/3% of unpaid principal, or receipt of Series B and C Exchange Bonds. Creditors holding notes and 1991 general obligation bondholders will receive Series D Exchange Bonds in a face amount of approximately $30.8 million. This amount equals all unpaid principal and interest of approximately $8.9 million as of May 1, 1999, and includes a write up of over $20 million to compensate for the flat 8% interest rate to be paid on the Exchange Bonds.

CDN will potentially receive all series of Exchange Bonds. It will receive Series A

---

15. "Additional tap revenues" are defined by the Plan as anything above a $1,000.00 residential tap fee or the commercial equivalent. The Plan provides that "additional tap revenue" may, in the District's discretion, be used to pay either Series B, C or D Exchange Bonds or infrastructure costs.

Exchange Bonds for advancing up to $1,782,000.00 [16] for payment of administrative claims, for payment to Citywide Bank [17] and for payment of the Indenture Trustee's expenses up to a maximum of $250,000.00 (Class 7). Series Exchange A Bonds will also be issued to CDN as partial payment for the District's purchase of water rights and water and sewer tap rights. The price for the water and water and sewer tap rights has been set by the District and CDN at $11,844,529.00. Neither CDN nor the District presented evidence as to how this price was determined, and the uncontroverted evidence suggests it greatly exceeds fair market value. The District allocates $1,636,000.00 for the water rights,[18] but according to uncontroverted testimony by Dr. Danielson, the fair market value of the specific rights to be transferred is only $214,000.00.[19] The District allocates $10,208,529.00 for the water/sewer tap rights which equates to $23,852.00 per tap for 428 taps.[20] According to the District's expert, THK, the District can sell each tap for only $9,084.00,[21] which suggests that the District is overpaying CDN by almost $15,000.00 per tap.

For funding the cash payment to 1985 bondholders, CDN will acquire Series B and C Exchange Bonds. CDN also will receive 83% or approximately $146.4 million of the Series D Exchange Bonds in exchange for the following:

|  | (Approximately) |
|---|---|
| Water rights and taps (the remaining purchase price not compensated with Series A Exchange Bonds) | $ 8.6 million |
| Unpaid principal and interest on notes | |

| | |
|---|---|
| purchased from RTC | 41.6 million |
| Total | $50.2 million |

The District has entered into the Plan Funder Agreement with CDN which obligates CDN to provide the funding necessary to implement the Plan. In consideration for funding, the District agrees that it will not increase property taxes above 37 mills, it will not impose any fee, or sell or pledge any of its property as collateral without CDN's prior approval until all of the Exchange Bonds held by CDN are paid. CDN is free to withhold its approval on any of these issues.

If the Plan is confirmed, the Exchange Bonds will be issued upon counsels' opinions. The District's municipal law counsel, Lee Phillips, is prepared to give an opinion that the District has complied with its organizational directives and applicable Colorado law in issuing the Exchange Bonds and raising the District's tax levy to 37 mills. The District's bond counsel, Loring Harkness II, is prepared to give an opinion that the Exchange Bonds can be issued under Colorado law and will be double tax exempt.[22] Although a bond opinion ordinarily includes analysis of the feasibility of repayment, Mr. Harkness has not assessed the feasibility of repayment of the Exchange Bonds. His opinion will rely upon the determination of feasibility inherent in a Chapter 9 confirmation order.

### 5. Funding Projections

According to its projections, the District intends to pay the Exchange Bonds with taxes generated from increasing its mill levy from the current level of 21.45 to 37

---

16. An amendment to the Plan Funder Agreement, Exhibit A to Plan, increases this amount to $1,960,000.00.

17. This debt is secured by the District's existing water rights. The Plan proposes to pay this debt in full to obtain the release of the collateral.

18. Exhibit A to the Plan.

19. Exhibit 2P.

20. Exhibit A to the Plan.

21. Exhibit 24.

22. The interest on the bonds is intended to be exempt from both federal and Colorado income taxes.

and fees generated by the sale of water/sewer taps. Both sources of future revenue depend upon District development in accordance with THK's Development Projections (Development Projections),[23] which anticipate aggressive, immediate, sustained and complete development of all land within the District over a 40–year period.

THK anticipates that at least 1880 residential units will be built at a pace of approximately 200 detached homes per year during the first five years; 60 condominiums or townhomes per year for seven years; and, 400 apartment units during the first ten years. In addition, THK projects that 4.56 million square feet of commercial space will be built in the next ten years, which includes a 1.6 million square foot regional shopping mall to open in year 2001. During the first ten years, THK forecasts that an average of 9.9 acres per year will be filled by office space and an average of 10.4 acres per year will be developed for high-tech industrial use. The Development Projections also anticipate straight line appreciation in land values for the full 40–year period at 5%.

Conceptually, this could result in an increase in value in some parcels over a 39–year period of over 670%.

The Development Projections leave no room for error. They must be met precisely or exceeded in order for the District to repay the Exchange Bonds within the 40–year window. If any error, miscalculation or unanticipated circumstance slows or impedes development, the District will be unable to generate the tax revenues and tap fees required to pay the Exchange Bonds as projected.

Jean Townsend, an economist and expert with regard to real estate development projections, testified that the Development Projections are based upon inaccurate assumptions and are internally inconsistent. As a consequence, she concluded that they are overly optimistic, speculative and unrealistic. To a large degree, Ms. Townsend's opinions were unrebutted. However, to the extent her conclusions conflict with the testimony of E. Peter Elzi, Jr., from THK, the Court finds Ms. Townsend's

**23.** Exhibit 24. Samples from the Development Projections in Exhibit 24 are set forth in the following chart:

### THK Development Projections

| Year | No. of New Residential Units that year | Cumulative Value of Residential Property | Sq. Ft. of New Commercial Units that year | Cumulative Value of Commercial Property | Anticipated Tax Revenues | Anticipated Tap Fee Revenues | Total Anticipated Revenues |
|---|---|---|---|---|---|---|---|
| 1999 | 0 | | | $0 | $10,000 | | $10,000 |
| 2000 Projections | 260 | $51 million | 190,000 | $20 million | 0 | $1 million | $1 million |
| 2001 Projections | 260 | $106 million | 1,790,000 | $395 million | <$1 million | $2 million | $2 million |
| 2002 Projections | 460 | $187 million | 365,000 | $477 million | $5 million | $1 million | $6 million |
| 2003 Projections | 260 | $255 million | 610,000 | $605 million | $6 million | $1 million | $7 million |
| 2008 Projections | 0 | $487 million | 610,000 | $1 billion | $11 million | <$1 million | $11 million |
| 2018 Projections | 0 | $793 million | 460,000 | $2.3 billion | $25 million | <$1 million | $25 million |
| 2028 Projections | 0 | $1.3 billion | 480,000 | $4.8 billion | $51 million | $1 million | $52 million |
| 2038 Projections | 0 | $2.1 billion | 500,000 | $9.8 billion | $104 million | $1 million | $105 million |

testimony more credible. Ms. Townsend opined that:

(1) Without explanation, THK uses different figures in its narrative report than those used in its spreadsheet calculations. For example, THK uses a FAR[24] of 0.35 for office development in the report text but a larger FAR of 0.85 in its spreadsheet. Similarly, THK's text figures refer to a FAR of 0.30 for industrial development, but a FAR of 0.70 on the spreadsheet and a FAR of 0.22 for the first ten years of retail development in the text, but a FAR of 0.35 on the spreadsheet. The text also refers to a 4% property appreciation rate while the spreadsheet uses a 5% rate. The higher figures in the spreadsheet result in higher projected revenue, which is necessary for Exchange Bond payment within 40 years.

(2) The timing for future development is unrealistically swift, especially given the water and water infrastructure needs of the District. Dr. Danielson's timeline of 6–7 years before revenue can be derived from development is more realistic.

(3) The densities projected for development are unprecedented in the metro-Denver area and, in some cases, are inconsistent with zoning restrictions. For example, existing office buildings in the metropolitan area typically have a density of 0.3 to 0.5 FAR, but THK projects a density of 0.85 FAR. The Development Projections also anticipate that some buildings will exceed the 60–foot height restriction which would violate existing zoning restrictions. Use of these densities overstates reasonable revenues by at least 26%.

(4) The Development Projections anticipate higher property values and higher tax revenues than are reasonable. THK assumes that the estimated real estate value for homes and commercial buildings will increase at a uniform rate of 5% over 40 years, thereby ignoring the boom and bust cycles which the Denver economy has historically experienced. Sometime during the next 40 years it is reasonable to expect a "down" market which will impact the pace of development as well as property values. In addition, THK assumes that retail development will have a market value of $200.00 per square foot even though $100.00 per square foot is an appropriate value for retail constructed in 1999.[25]

(5) THK's projected market capture rates for office development and high-tech industrial development are without precedent and are unsubstantiated. Without explanation, THK assumes that the District's market capture rate for office development in the southwest submarket will be 49%. Ms. Townsend believes that a 20% rate is aggressive, but more reasonable, given the number, quality, visibility and head start of the competition. THK forecasts a 21% capture rate for high-tech industrial property, but without adequate history of high-tech development in the southwest submarket, the capture rate is speculative. Ms. Townsend opines that a 10% rate would be aggressive, but more reasonable.

(6) Use of the current percentage for assessed tax value for residential property, without any downward adjustment over the next 40 years, is inconsistent with Colorado law. Al-

24. A FAR, the standard measure of density for nonresidential development, is the floor-area-ratio, or the amount of building square footage divided by the amount of land.

25. This $100.00 is a blend of $170.00 for an in-line regional mall, $50.00 for an anchor regional mall, and $100.00 for other retail.

though the ratio of assessed value to actual value for commercial property may continue to be 29%, given Colo. Const.Art. X, § 3 and C.R.S. § 39-1-104.2, the assessed value of residential property relative to actual value will likely decrease from the current percentage of 9.74.[26]

The inaccuracies and unsupported assumptions in the Development Projections substantially affect the anticipated revenues. According to Ms. Townsend, more reasonable assumptions would reduce anticipated revenues by 92%. This would reduce the total projected revenues for the next 40 years from approximately $1.4 billion to $100 million, which is less than the $194 million face amount of the Exchange Bonds to be issued.

### 6. Bond Repayment and Future Expenses

The District's amortization schedule for Exchange Bond repayment[27] depends entirely upon THK's Development Projections. The amortization schedule does not take into account the different priorities for repayment of the Series A, B, C and D Exchange Bonds or the variance in the callability of different series; it simply provides that no principal will be paid on any bonds until year 38. It shows that all of the District's revenues from taxes and tap fees for the next 40 years are necessary to repay the Exchange Bonds within such period and that even with projected development the anticipated revenues will not keep interest payments current. As a result, interest on the Exchange Bonds will compound as principal for the first 27 years, thereby increasing the District's bond debt to almost $568 million. If the District's actual revenues are less than projected, or are diverted to any other purpose, the principal debt will exceed such sum and revenues will be insufficient

to pay the Exchange Bonds within 40 years.

The District presented no projections as to future operating expenses. The Plan provides that the District may, in its discretion, use up to $150,000.00[28] of tax revenues per year for operating expenses or debt repayment, but the amortization table shows all projected revenues committed to bond repayment. If all revenues are used to repay the Exchange Bonds, nothing remains for acquisition of additional water rights, for infrastructure or for funding the District's ongoing operations as required by its 1983 Service Plan. Even if $150,000.00 were available for operations, it would be insufficient for such purposes. The District suggests that it might charge fees for water and sewer services, but no evidence as to what revenues might be generated was presented.

### 7. Executory Contracts

As part of the Plan, the District proposes to assume 15 executory contracts. Four of these contracts are PIAs between the District and the Cities. Each agreement obligates the District to provide specific infrastructure necessary for development, which the District has not yet fully performed. Landowners are parties to some of the agreements and some agreements have been recorded, presumably to create covenants running with the land. As a result, some landowners may be guarantors or co-obligors with the District, or they may hold title to the land subject to the agreements.

Under the Springfield Green PIA (dated 1986),[29] the District has unperformed obligations to provide infrastructure and services including water distribution and treatment, sewer services, storm drainage, streets, street lights and funding for a recreation facility. The District also has

---

26. Exhibit 71.

27. Exhibit L to the Third Revised Disclosure Statement.

28. Plan, Art. VIII ¶ 8.3.

29. Exhibit 12.

unperformed obligations to provide sidewalks and traffic signals pursuant to the Red Rocks Business Park Filing No. 1 Agreement (dated 1983).[30] Because neither agreement sets a specific date for the District's performance, the District is not currently in default.

Under the Red Rocks Centre PIA with Morrison (dated February 20, 1985),[31] the District has unperformed obligations to provide water and sewer lines, water distribution facilities, storm drainage facilities, streets, curbs, gutters, sidewalks and street lighting. Under the Water and Sewer Joint Use Agreement (dated November 16, 1982),[32] the District has unperformed obligations to fund the doubling of the capacity of Morrison's water treatment plant, to contribute sufficient water rights for raw water to obtain the desired treated water from Morrison and to fund a water storage reservoir, storage tank and sewage treatment plant. Because neither of these agreements specify a date by which the District's performance is required, the District is not currently in default.

Notwithstanding proposed assumption of these agreements, the District does not intend nor is it able to supply the infrastructure required. The Plan and bond repayment projections are premised upon the District *not* providing the infrastructure required by the agreements. Instead, the Plan is premised upon the belief that landowners will shoulder the District's burden. According to the Third Revised Disclosure Statement, page 42:

Among the assumptions upon which future development is premised, are the District plans for the provision of infrastructure that will support the development contemplated within Exhibit G [THK Development Projections]. **All additional infrastructure required, as well as modifications required to existing infrastructure will be paid for by landowners within the District on a "pay as you go" basis.** . . . However, at the present time there is no specific method or plan to raise funds from the disparate landowners, and such method, whether by way of assessment, joint development agreement or some other means to allocate, the infrastructure costs must be in place prior to installation of such infrastructure. (emphasis added).

Neither the Cities nor the landowners have agreed to excuse the District from performing its obligations under the subject PIAs. The District presented no evidence of current landowners' ability or willingness to fund the installation of infrastructure. The Plan allocates no future revenue to infrastructure obligations, and the Plan Funder Agreement precludes the District from further raising taxes to pay for infrastructure costs without CDN's consent.

### III. ISSUES PRESENTED

Confirmation of a plan proposed in a Chapter 9 case is governed by 11 U.S.C. § 943. Section 943(b) sets forth seven requirements:[33]

(b) The court shall confirm the plan if—

---

30. Exhibit 13.

31. Exhibit 17.

32. Exhibit 14.

33. The District argues that the language of § 943(b) is permissive, thereby allowing the Court to confirm a Chapter 9 plan even if the enumerated standards are not satisfied. This argument is based upon the language of § 943(b) which states that "the Court shall confirm the plan if," which contrasts with the language of 11 U.S.C. § 1129, allowing confirmation of a Chapter 11 plan "only if" all of the statute's sub-parts are satisfied. The District relies solely upon footnote 2 in *In re City of Colo. Springs Spring Creek Gen. Improvement Dist.*, 177 B.R. 684, 688 (Bankr.D.Colo. 1995). The District's reliance is misplaced. As the author of *Spring Creek*, this Court notes that the footnote was dicta; the issue of whether § 943(b) allows a more relaxed standard for confirmation than § 1129 was neither argued nor resolved in *Spring Creek*.

(1) the plan complies with the provisions of this title made applicable by sections 103(e) and 901 of this title;

(2) the plan complies with the provisions of this chapter;

(3) all amounts to be paid by the debtor or by any person for services or expenses in the case or incident to the plan have been fully disclosed and are reasonable;

(4) the debtor is not prohibited by law from taking any action necessary to carry out the plan;

(5) except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that on the effective date of the plan each holder of a claim of a kind specified in section 507(a)(1) of this title will receive on account of such claim cash equal to the allowed amount of such claim;

(6) any regulatory or electoral approval necessary under applicable non-bankruptcy.law in order to carry out any provision of the plan has been obtained, or such provision is expressly conditioned on such approval; and

(7) the plan is in the best interests of creditors and is feasible.

As noted in the factual findings, there is no dispute as to the facts satisfying the confirmation requirements of § 943(b)(3) and (5). The District's proffer in satisfaction of subsection (b)(4) and (6) is unopposed. At issue is whether the Plan satisfies the requirements of § 943(b)(1), (2) and (7).

The Cities contend that the Plan is not feasible as required by § 943(b)(7) because (1) it is unworkable and (2) the District cannot assume the PIAs with Lakewood and Morrison, which assumption is a condition precedent to confirmation. The Cities also argue that the Plan does not comply with § 943(b)(1) and (2) because it is not proposed in good faith, but instead by means forbidden by law. Westwind did not appear at the hearing, but its written objection adopts the arguments of the Cities. Additionally, it contends that the District has failed to satisfy § 943(b)(1) and (2) because it, as an owner of property within the District, was not given an opportunity to vote.

These arguments present the Court with three issues:

1. Is the Plan feasible?

2. Can the District assume the PIAs?

3. Has the Plan been proposed in good faith and not by a means forbidden by law? Embedded in this question is the issue of whether the landowners within the District were entitled to vote on the Plan?

## IV. ANALYSIS

### 1. Is the Plan feasible?

### a. The definition of feasibility and the factors to be considered.

The District bears the burden of satisfying the confirmation requirements of § 943(b) [34] by a preponderance of the evidence.[35] Among the enumerated requirements, the Plan must be both in the "best interests of creditors" and "feasible." 11 U.S.C. § 943(b)(7). The parties agree that the Plan satisfies the best interest test; however, they dispute its feasibility.

The Code does not define feasibility in Chapter 9 nor does it specify what factors the Court should consider in determining whether the Plan is feasible. Due to the

---

**34.** *In re Corcoran Hospital District,* 233 B.R. 449, 452 (Bankr.E.D.Cal.1999).

**35.** By the Code's incorporation of certain confirmation standards in § 1129 into Chapter 9, it is logical to conclude that in Chapter 9, like Chapter 11, a proponent of a plan must prove the confirmation requirements under 11 U.S.C. § 1129(a) by a preponderance of

the evidence. *Financial Security Assurance Inc. v. T–H New Orleans Ltd. Partnership (In re T–H New Orleans Ltd. Partnership),* 116 F.3d 790, 801 (5th Cir.1997); *Liberty Nat'l Enter. v. Ambanc La Mesa Ltd. Partnership (In re Ambanc La Mesa Ltd. Partnership),* 115 F.3d 650, 653 (9th Cir.1997).

relative rarity of Chapter 9 cases, neither the parties nor the Court have found case law specifically addressing the issue. In the absence of statutory and judicial guidance, the parties argue that the feasibility test in Chapter 9 should be the same as that applied to plans of reorganization proposed in Chapter 11 cases. Although it is tempting to simply borrow the Chapter 11 feasibility analysis, such convenience would overlook differences in the language of the applicable Code sections as well as in the origin and purpose of each type of reorganization.

The feasibility test in Chapter 11 is actually a requirement that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). This provision is well suited to the purpose and limitations of and alternatives to Chapter 11 reorganization.

■ Chapter 11 provides for reorganization of business entities. The purpose of a Chapter 11 reorganization is to restructure a business's finances so that it may continue to operate, provide its employees with jobs, pay its creditors and produce a return for its stockholders.[36] A Chapter 11 debtor need not be insolvent to be eligible for relief. Indeed, Chapter 11 cases can be initiated for any of an infinite variety of business reasons. For example, a Chapter 11 for a solvent business might allow it to reject unprofitable executory contracts or segregate and restructure debts associated with a troublesome or unprofitable product line. A Chapter 11 case can be initiated voluntarily or involun-

tarily. A plan of reorganization can be proposed by either the debtor or its creditors. A trustee can be appointed and, if reorganization is not possible, the case can be converted to Chapter 7 for liquidation of a debtor's assets. The alternative to Chapter 11 is an out-of-court composition which ordinarily requires consent of all creditors. However, within Chapter 11, a plan of reorganization can be confirmed without universal creditor acceptance.

■ In contrast to § 1129(b)(11), § 943(b)(7) requires a finding that the plan is "in the best interests of creditors and is feasible." This language grows out of Chapter 9's long history. Chapter IX became part of the Bankruptcy Act in response to widespread municipal defaults. Initial legislation, which provided for involuntary reorganizations,[37] was declared unconstitutional because it materially restricted states in control of their governmental and fiscal affairs.[38] A later enactment,[39] without involuntary provisions, survived constitutional scrutiny.[40] Chapter IX provisions were amended in the 1940's and again in 1976 to address the deteriorating financial condition of New York and other cities,[41] which amendments were, in large part, incorporated into the current Chapter 9 of the Bankruptcy Code.[42]

■ The purpose of reorganization under Chapter 9 is to allow municipalities created by state law to adjust their debts through a plan voted on by creditors and approved by the Bankruptcy Court. Unlike businesses in Chapter 11, a municipality must be insolvent to be eligible for relief. 11 U.S.C. § 109(c)(3). The insolvency requirement has a functional rather

---

36. H.R.REP. No. 95–595, at 220 (1977).

37. The Act of May 24, 1934, ch. 345, 48 Stat. 798 (1934).

38. *Ashton v. Cameron County Water Improvement Dist. No. 1*, 298 U.S. 513, 56 S.Ct. 892, 80 L.Ed. 1309 (1936).

39. The Act of Aug. 16, 1937, ch. 657, 50 Stat. 653 (1937).

40. *United States v. Bekins*, 304 U.S. 27, 58 S.Ct. 811, 82 L.Ed. 1137 (1938).

41. H.R.REP. No. 94–686, at 4 (1975).

42. S.REP. No. 95–989, at 8–9 (1978).

than a balance sheet focus; to be insolvent, a municipality either is not paying its debts as they come due or will be unable to do so. 11 U.S.C. § 101(32)(C). Consistent with the concept of limited federal jurisdiction over governmental entities created by state law, the insolvency requirement limits eligibility under Chapter 9. It also suggests that Chapter 9 is a means to remedy insolvency, unlike Chapter 11 which can be used by a solvent entity to restructure its affairs for business purposes.

▆▆▆▆ Like Chapter 11, Chapter 9 offers the opportunity to modify debt structure without the consent of all creditors. However unlike Chapter 11, Chapter 9 cases cannot be involuntarily initiated by creditors; creditors may not propose a plan; a trustee cannot be appointed and the inability to reorganize cannot result in liquidation of the municipality's assets under Chapter 7. The only alternative to Chapter 9 is restructuring by the municipality in accordance with state law, which may be difficult and may require voter approval. The role of the Bankruptcy Court in Chapter 9 is to supervise the reorganization process; in the plan confirmation process it is limited to disapproving or to approving the municipality's proposed plan.[43]

Prior to 1976, confirmation of a Chapter IX plan required that the Court find that it was "for the best interests of creditors" and "fair and equitable."[44] Feasibility was embedded in the "fair and equitable" requirement.[45] To determine that a plan was "fair and equitable," especially when future tax revenues were the only source of payment of claims, the Court was required to make express findings, based on current and projected future revenues and expenses, as to whether it was probable that the debtor would be able to pay creditors' claims. *Kelley v. Everglades Drainage Dist.*, 319 U.S. 415, 419–420, 63 S.Ct. 1141, 87 L.Ed. 1485 (1943). This decision was understood to require that the municipality demonstrate a balanced budget within a reasonable period after confirmation of the plan.[46] The 1976 amendments

---

**43.** 11 U.S.C. §§ 904 and 943(b). *Leco Properties, Inc. v. R.E. Crummer & Co.*, 128 F.2d 110, 113 (5th Cir.1942).

**44.** Act of June 28, 1940, ch. 438, 54 Stat. 667, 669–670 (1940); H.R.Rep. No. 94–686, at 32 (1975).

**45.** H.R.Rep. No. 94–686, at 32 (1975).

**46.** In conjunction with the Act of Apr. 8, 1976, Pub.L. No. 94–260, 90 Stat. 315 (1976), Congressmen Butler, Kindness, Hutchinson, McClory, Moorhead and Hyde expressed concern that confirmation of a Chapter IX plan be conditioned upon the municipality showing a balanced budget which demonstrated both its ability to repay debt in accordance with the plan and to provide continuing government services. "We recognize the argument that the terms fair, equitable, and feasible when interpreted in light of the case law mean a balanced budget, but we cannot understand the reluctance to make perfectly clear the congressional intent to require that a plan for adjustment of municipal indebtedness which is to receive the blessing of a federal court must include a requirement that the budget of the rescued municipality must be in balance within a reasonable period of time after confirmation of the plan." H.R.Rep. No. 94–686, at 60 (1975).

Congressman Kindness raised this concern, again, in conjunction with enactment of the Act of Apr. 8, 1976, Pub.L. No. 94–260, 90 Stat. 315 (1976). He was assured by Congressman Edwards that although no balance sheet test was expressly imposed, the "feasibility" requirement in the Code was both broad and flexible enough to ensure the Court's careful review of projected future revenues and expenses.

Mr. KINDNESS. I thank the gentleman. There has been much discussion over the requirement that a petitioner present information to the **court that will enable the court to determine that the petitioner has balanced its budget, or will balance it within a reasonable period of time. Yet I do not find anything in the bill to that effect.** Would you explain that?

Mr. EDWARDS of California. If the gentleman will yield, there is **something in the bill that requires just what you suggest. It is in section 94(b)(1). It is the requirement that the plan be feasible. This requirement is in current law, though not explicitly. It was inserted into the bill to codify the current case law. The feasibility**

deleted the "best interests of creditors" test [47] as redundant of the "fair and equitable" requirement,[48] but expressly included a determination of "feasibility." [49]

The historical "fair and equitable" requirement is now embodied in certain provisions of § 1129 which are incorporated by reference into Chapter 9 through § 901(a). The "best interest" requirement of § 943(b)(7) is generally regarded as requiring that a proposed plan provide a better alternative for creditors than what they already have.[50] This is often easy to establish. Since creditors cannot propose a plan; cannot convert to Chapter 7; cannot have a trustee appointed; and cannot force sale of municipal assets under state law, their only alternative to a debtor's plan is dismissal. Outside of bankruptcy, general unsecured creditors often have little possibility of being repaid, especially where the municipality's debt burden is too high to be retired by taxes. Therefore, any possibility òf payment under a Chapter 9 plan is often perceived by creditors as a better alternative. With few options and little negotiation leverage, either inside or outside of bankruptcy, creditors may accept even a hopelessly infeasible Chapter 9 plan in preference to the non-bankruptcy status quo.

One bankruptcy commentator suggests that the "best interest" test acts as a floor

requiring a reasonable effort at payment of creditors by the municipal debtor and that the "feasibility" requirement sets a corresponding ceiling which prevents the Chapter 9 debtor from promising more than it can deliver.[51] The question is what must be feasible—only repayment of pre-petition debt or repayment of debt in conjunction with provision of continued governmental services?

This is where the differences between Chapter 11 and Chapter 9 become important. The primary purpose of debt restructure for a municipality is not future profit, but rather continued provision of public services. The insolvency test measures whether a municipality can pay for the services it provides. Since insolvency is the foundation of Chapter 9 eligibility, it would make little sense to confirm a reorganization plan which does not remedy the problem. Stated differently—there is no purpose in confirming a Chapter 9 plan if the municipality will be unable to provide future governmental services. Some Chapter 9 plans expressly or impliedly anticipate continued provision of services. For these plans, determination of the feasibility of the plan covers both repayment of pre-petition debt and future services. But in this case, where the Plan addresses only payment of pre-petition debt, the Court cannot turn a blind eye to the purpose of Chapter 9. The Court must, in the

requirement incorporates the balanced budget concept which you addressed, but with increased flexibility as well as greater court supervision.

In Kelly [sic] against Everglades Drainage District, the Supreme Court in the early 1940's made it very clear that before a district court could confirm a plan under chapter IX, the fair and equitable requirement, **also found in the same section as the feasibility requirement, required that a reasoned estimate be made of current and projected future revenues and expenses in order that the court be able to evaluate the likelihood of performance and the availability of funds to meet the petitioner's obligations under the plan.** (emphasis added).

121 Cong.Rec. H39413 (daily ed. Dec. 9, 1975) (remarks of Reps. Kindness and Edwards),

*reprinted in* Norton Bankr.Law and Practice 2d at 915 (1998–99).

47. The Act of Apr. 8, 1976, Pub.L. No. 94–260, 90 Stat. 315, 323 (1976) [then 11 U.S.C. § 403(e)]; The Act of Aug. 16, 1937, ch. 657, 50 Stat. 653, 658 (1937).

48. H.R.Rep. No. 94–686, at 14 (1975).

49. Act of Apt. 8, 1976, Pub.L. No. 94–260, 90 Stat. 315, 323 (1976); H.R.Rep. No. 95–595, at 400 (1977); H.R.Rep. No. 94–686, at 32 (1975).

50. 4 Collier on Bankruptcy, ¶ 943.03[7] (Lawrence P. King, ed., 15th ed.1999).

51. *Id.*

course of determining feasibility, evaluate whether it is probable that the debtor can both pay pre-petition debt and provide future public services at the level necessary to its viability as a municipality.[52]

For this purpose some, but not all, of the factors used in determining the feasibility of Chapter 11 plans are helpful. As with cases in Chapter 11, a Chapter 9 feasibility finding should " 'prevent confirmation of visionary schemes which promise creditors ... more under a proposed plan than the debtor can possibly attain after confirmation.' " *Travelers Ins. Co. v. Pikes Peak Water Co. (In re Pikes Peak Water Co.)*, 779 F.2d 1456, 1460 (10th Cir. 1985), *quoting Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.)*, 761 F.2d 1374, 1382 (9th Cir.1985) (quoting 5 COLLIER ON BANKRUPTCY, ¶ 11.29.02[11] at 1129–134 (15th ed.1984)). A plan should offer a reasonable prospect of success and be workable. In Chapter 9, this requires a practical analysis of whether the debtor can accomplish what the plan proposes and provide governmental services. Although success need not be certain or guaranteed, more is required than mere hopes, desires and speculation. *Clarkson v. Cooke Sales & Serv. Co. (In re Clarkson)*, 767 F.2d 417, 419–20 (8th Cir. 1985); *In re Grandfather Mountain Ltd. Partnership*, 207 B.R. 475, 485–86 (Bankr. M.D.N.C.1996); *Crestar Bank v. Walker (In re Walker)*, 165 B.R. 994, 1003–04 (E.D.Va.1994); *Affiliated Nat'l Bank—Englewood v. TMA Assoc. Ltd. (In re TMA Assoc. Ltd.)*, 160 B.R. 172, 177 (D.Colo. 1993). The probability of future success will depend upon reasonable income and expense projections. As with plans proposed under Chapter 11, if performance of a Chapter 9 plan is based upon deferred payments, projections of future income and expenses must be based upon reasonable assumptions and must " 'not be speculative or conjectural.' " *Ames v. Sundance State Bank (In re Ames)*, 973 F.2d 849, 851 (10th Cir.1992), *quoting In re Novak*,

102 B.R. 22, 24 (Bankr.E.D.N.Y.1989). Plan terms which provide for negative amortization, or for deferred payments over an extensive period of time, may make the showing of feasibility difficult. *See Sunflower Racing, Inc. v. Mid–Continent Racing & Gaming Co. I (In re Sunflower Racing, Inc.)*, 226 B.R. 673, 690 (D.Kan.1998); *In re Grandfather Mountain Ltd. Partnership*, 207 B.R. at 485–86; *In re 8315 Fourth Ave. Corp.*, 172 B.R. 725, 734 (Bankr.E.D.N.Y.1994); *In re TMA Assoc., Ltd.*, 160 B.R. at 177; *In re White*, 36 B.R. 199, 204–05 (Bankr.D.Kan. 1983). Indeed, a feasibility showing premised upon long-term repayment or negative amortization may be particularly difficult for the Chapter 9 debtor, which must not only demonstrate a probability that it will be able to pay on pre-petition debt in accordance with the plan, but must also demonstrate the probability that it can continue to provide public services while it repays debt.

### b. Is the feasibility finding abrogated by creditor approval?

The Committee argues that the Court should disregard the Cities' feasibility objection in light of the Plan's overwhelming support by creditors. The Committee complains that the Cities are over funded, governmental entities intent upon upsetting a proposal which is otherwise acceptable to creditors. It argues that because the Cities can exercise powers outside the bankruptcy process to protect their interests, they should play a limited role with regard to confirmation.

This argument has two features. First, it implies that some attribute (size, funding or alternative remedies) of governmental entities should preclude their objection. Nothing in the Bankruptcy Code supports this position. The Code does not distinguish among individuals, non-natural persons and governmental entities in so far as status to participate as

**52.** *Id.*

parties-in-interest. Indeed, the Court has previously denied the District's motion to overrule the objections of the Cities for lack of standing.[53] As parties to executory contracts which the District intends to assume, the Cities' interests are affected by confirmation of the Plan. Although the Cities have mounted a vigorous attack (and may have out-spent the District in the confirmation process), such exercise is consistent with their legal rights.

■ Second, this argument focuses upon the "best interest" element of § 943(b)(7) and urges the Court to ignore the "feasibility" requirement. This the Court cannot do. Not only is feasibility an express requirement set out in § 943(b)(7), but the long history of Chapter 9 requires an objective evaluation of the feasibility of the District's proposed reorganization. The Court is guided by the teaching of the United States Supreme Court in *Kelley v. Everglades Drainage Dist.*, 319 U.S. 415, 418–19, 63 S.Ct. 1141, 87 L.Ed. 1485 (1943) when it addressed the feasibility of a Chapter 9 plan in application of the fair and equitable standard:

> And, as stated in the Consolidated Rock Products case, supra, the fact that only a very small minority of creditors have objected to the plan does not relieve the courts of the duty of appraising its fairness, and of making the findings necessary to support such an appraisal. As we said in the Chicago, Milwaukee, St. Paul and Pacific case (citation deleted), minorities under the various reorganization sections of the Bankruptcy Act 'cannot be deprived of the benefits of the statute by reason of a waiver, acquiescence or approval by the other members of the class.' The applicability of that rule to proceedings under Ch. IX is plain. We stated in *American United Mutual Life Ins. Co. v. Avon Park* (citation deleted), 'the fact that the vast majority of security holders may have ap-

proved a plan is not the test of whether that plan satisfies the statutory standard. The former is not a substitute for the latter. They are independent.'

**c. Is the feasibility inquiry limited to the District's ability to issue Exchange Bonds?**

■ The District argues that the feasibility inquiry should be limited to whether the District can issue Exchange Bonds. It argues that a determination of feasibility does not require an evaluation as to whether the District can pay the Exchange Bonds or, implicitly, whether the District can both pay the Exchange Bonds and provide future services as required by its Service Plan. The Court agrees with the conclusion of the Bankruptcy Court in Nebraska, that although a Chapter 9 debtor may modify its obligations to bond holders, the plan is not feasible if the bonds proposed to be issued will not, under the circumstances contemplated by the plan, be paid in full. *In re Sanitary & Improvement Dist. No. 7*, 98 B.R. 970, 973 (Bankr. D.Neb.1989).

A feasibility determination based simply upon whether the District can issue Exchange Bonds, as compared to whether it can pay them, would be so superficial as to be meaningless. The Exchange Bonds represent nothing more than a means by which the District will modify and, in the case of some creditors, enlarge pre-petition debt. The testimony of Mr. Harkness, the District's bond counsel, and Mr. Phillips, municipal counsel, unequivocally establish that Exchange Bonds can be issued if the Plan is confirmed. However, their testimony begs the issue. Outside of bankruptcy, issuance of revenue bonds would depend upon a favorable opinion by bond counsel not only as to their legality and tax status, but also as to the feasibility of repayment. In this case, bond counsel's opinion is missing the requisite feasibility

---

**53.** *In re Mount Carbon Metropolitan District,* No. 97–20215 MSK (Bankr.D.Colo. July 20, 1999).

analysis; he, instead, will rely upon the Court's confirmation order. Put simply, if the Court fails to consider and determine the feasibility of bond repayment, no evaluation will occur, perhaps to the detriment of current bond holders and their transferees. To the extent that the purpose of Chapter 9 is to assist a municipality in restructuring debt so that it can provide future services, limiting the feasibility analysis to mere issuance of Exchange Bonds would leave the Chapter 9 plan without context, purpose or efficacy.

### d. The evidence does not establish that the Plan is feasible.

██ Colloquially described as a "dirt district," this District was initially created to obtain financing for acquisition and installation of infrastructure necessary for development. A dirt district initially benefits landowners by issuing bonds to fund infrastructure costs, which are then repaid from tax revenues generated after development. After development as a metropolitan district, this District is obligated to provide continuing public services in accordance with its Service Plan. These services include water, sewer and sanitation, as well as street improvements, safety protection and park and recreation facilities to landowners.

The question of the Plan's feasibility is not a question of whether land within the District should or can be developed. All parties agree that development is desirable and that current economic conditions favor it. The question of feasibility is whether the Plan is a suitable vehicle for the District to repay its pre-petition debts and to provide future public services.

### 1) The District has presented insufficient evidence of projected expenses and its ability to provide future services.

On the most superficial level, the District has failed to establish the feasibility of the Plan because it has projected future revenues, but not future expenses. The omission is particularly glaring in light of

(1) the District's proposed assumption of all executory contracts (at least four of which require infrastructure installation), (2) the District's need for additional water rights and water/sewer infrastructure in order to develop, and (3) the District's Service Plan. Without reasonable projections of future expenses to compare to future revenues, the District has failed to provide the evidence necessary to establish feasibility.

Despite the absence of projections, it is clear that there will be future expenses. The Plan states that $150,000.00 per year from "tax revenues" could be used for operational costs and possibly some additional tap fee revenues could be used for infrastructure costs, but the amortization schedule shows all projected revenues from all sources devoted to bond re-payment. If the $150,000.00 per year is made available for operating costs, it is unclear whether it will be adequate for the District to satisfy its Service Plan Obligations. It is not adequate to cover the cost of water acquisition and water and sewer infrastructure or the District's obligations under the PIAs it proposes to assume. The District's reliance upon landowners to cover all future infrastructure costs is unsupported by any evidence that landowners are able and willing to pay. According to the Plan Funder Agreement, the District cannot charge fees, increase taxes or secure any new financing without CDN's consent. Although the District may plan to charge for water and sewer service on a usage basis, no projections of such revenues were provided.

### 2) The District's revenue projections are not sufficiently reliable.

The existence of an adequate revenue stream to repay District debts depends upon the THK Development Projections which anticipate aggressive, uninterrupted and complete development of all land within the District over the next 40 years. Projecting for a few years into the future

is difficult; projecting for so many years into the future is extraordinarily difficult.

For the reasons identified by Ms. Townsend, the Development Projections are inflexible, overly optimistic and based upon unreasonable and conjectural assumptions. They represent an ideal scenario and fail to anticipate any fluctuation, deviation or upset in development momentum which historically has been manifested in cyclical boom/bust cycles in the Denver metropolitan area. Only if the Development Projections are met in their entirety or are exceeded, will there be sufficient revenue to retire the Exchange Bonds within 40 years. Should there be even the slightest inaccuracy in assumption, miscalculation, or an unanticipated event which limits or slows development, the revenue stream will be inadequate to pay the Exchange Bonds within 40 years. Development at the pace and with the scope projected may be remotely possible, but it is not probable.

### 2. Can the District assume the PIAs?

The Plan states that the District will assume 15 executory contracts, including various PIAs with the Cities. The Cities argue that the District cannot assume the PIAs because it cannot establish adequate assurance of future performance as required by 11 U.S.C. § 365(b). The District responds that § 365(b) only applies when a debtor has defaulted under the terms of an executory contract it proposes to assume. As there has been no default, the District argues no proof of future performance is required.

The arguments of both parties miss the point. Although it states it will assume the PIAs, the District does not intend to nor is it able to perform its obligations under them. The Code allows the District to "assume or reject any executory contract," but it must do one or the other.[54] It " 'cannot accept the benefits of an executory contract without accepting the burdens as well.' " *See Trigg v. United States (In re Trigg)*, 630 F.2d 1370, 1375 (10th Cir.1980); *quoting Schokbeton Industries, Inc. v. Schokbeton Products Corp.*, 466 F.2d 171, 175 (5th Cir.1972); *Kirby v. United States*, 329 F.2d 735, 737 (10th Cir.1964). A debtor " 'may not blow hot and cold. If he accepts the contract he accepts it *cum onere*. If he receives the benefits he must adopt the burdens. He cannot accept one and reject the other.' " *Kirby*, 329 F.2d at 738, *quoting In re Italian Cook Oil Corp.*, 190 F.2d 994, 997 (3rd Cir.1951) (emphasis added). Although the District could, theoretically, assume the PIAs, it has not chosen to do so.

In a contractual context, the District's statement that it does not intend to perform under the PIA's would constitute breach by anticipatory repudiation.[55] In a bankruptcy context, if the District does not assume both the benefits and burdens of an executory contract, it cannot assume it. If a contract is not expressly assumed, it is rejected.[56] Rejection acts as a breach which gives rise to a pre-petition claim.

Due to the District's admitted intent not to perform its obligations under the PIAs,

**54.** 11 U.S.C. § 365(a) provides for the District to make this choice. 11 U.S.C. § 901(a) makes § 365 applicable under Chapter 9. Under Chapter 9, the debtor (the District), rather than the trustee, exercises this power to assume or reject. 11 U.S.C. § 902(5).

**55.** In Colorado, " '[a]nticipatory repudiation centers upon an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance.' " *Schneiker v. Gordon*, 732 P.2d 603,

611 (Colo.1987), *quoting* C.R.S. § 4-2-610 comment 1. " 'In order to constitute an anticipatory breach of contract there must be a definite and unequivocal manifestation of intention on the part of the repudiator that he will not render the promised performance when the time fixed for it in the contract arises.' " *Johnson v. Benson*, 725 P.2d 21, 25 (Colo.App.1986), *quoting* 4 A. Corbin, Contracts § 973 (1951).

**56.** Art. IV to the Plan.

the Plan cannot be confirmed. Confirmation of the Plan is conditioned upon the District's assumption of the PIAs, which condition is unsatisfied. Rejection of the contracts requires that the Plan address the resulting claims of the Cities and provide them with an opportunity to vote. It does not.

### 3. Has the Plan been proposed in good faith and not by a means forbidden by law?

The Cities argue that the Plan has not been proposed in good faith because 1) it is not feasible and 2) CDN, rather than the District, is the Plan's primary beneficiary. They also argue that the Plan utilizes a means forbidden by law because the Plan Funder Agreement requires the District to delegate its governmental powers to CDN, which violates Colorado law. The District responds that the Plan is the result of spirited, and often contentious, arms-length negotiations with pre-petition creditors and that if the Plan is confirmed, the District will no longer be in danger of default on its debt.

The requirement that a Chapter 9 plan be "proposed in good faith and not by any means forbidden by law" is derived from 11 U.S.C. § 1129(a)(3), which is expressly incorporated in Chapter 9 by 11 U.S.C. § 901(a). Compliance with § 901 is a requirement for confirmation pursuant to § 943(b)(1).

▮ Like feasibility, the meaning of good faith in the context of Chapter 9 plan confirmation has not been frequently explored. Decisions considering good faith in a Chapter 9 context have addressed abuse of the bankruptcy procedure and unfair treatment of certain parties. Under the Bankruptcy Act, the United States Supreme Court reversed confirmation of a Chapter IX plan where the circumstances surrounding creditors' acceptances of a

plan were tainted by unfair dealing, breach of fiduciary obligations, and the need for protection of one class from encroachments of another. *Am. United Mutual Life Ins. Co. v. City of Avon Park, Fla.,* 311 U.S. 138, 61 S.Ct. 157, 85 L.Ed. 91 (1940). More recently, confirmation of a Chapter 9 plan was reversed for lack of good faith because a property owner whose future tax obligations were unfairly impacted was denied due process. *Ault v. Emblem Corp. (In re Wolf Creek Valley Metropolitan Dist. No. IV),* 138 B.R. 610 (D.Colo.1992). These decisions are fact specific. They reflect the general rule that a Chapter 9 plan proposed in good faith must treat all interested parties fairly and that the efforts used to confirm the plan must comport with due process. However, they do not set out a comprehensive framework against which the good faith of a Chapter 9 plan should be tested.

For general guidelines, it is helpful to refer to case law concerning confirmation of plans under Chapters 11 and 13, because both chapters also require that plans be "proposed in good faith and not by any means forbidden by law." [57] Most courts agree that a determination of good faith associated with Chapter 11 plan confirmation [58] requires a factual inquiry of the totality of the circumstances. *Financial Security Ass. Inc. v. T–H New Orleans Ltd Partnership (In re T–H New Orleans Ltd. Partnership),* 116 F.3d 790, 802 (5th Cir.1997); *Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.),* 764 F.2d 406, 408 (5th Cir.1985); *Jasik v. Conrad (In re Jasik),* 727 F.2d 1379, 1382–83 (5th Cir.1984), *quoting Public Finance Corp. v. Freeman,* 712 F.2d 219, 221 (5th Cir.1983); *Tenn–Fla. Partners v. First Union National Bank (In re Tenn–Fla. Partners),* 229 B.R. 720, 734 (W.D.Tenn.1999). In considering the circumstances of a Chap-

---

**57.** 11 U.S.C. § 1129(a)(3); § 1325(a)(3).

**58.** It is important to note that this is a different inquiry than whether the case was filed in

good faith. *See In re Madison Hotel Assoc.,* 749 F.2d 410, 425 (7th Cir.1984).

ter 11 case, Courts apply one of three tests:

> Under one view, the good faith requirement of § 1129(a)(3) is met if the plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code. Under another view, the good faith requirement is met if the plan was proposed with honesty and good intentions, and with a basis for expecting that a reorganization can be effected. Under a third view, good faith requires fundamental fairness in dealing with one's creditors.

*Tenn–Fla. Partners,* 229 B.R. at 734 (W.D.Tenn.1999), *quoting In re Gregory Boat Co.,* 144 B.R. 361, 366 (Bankr. E.D.Mich.1992) (citations and footnote omitted).

The Tenth Circuit Court of Appeals has not defined the standard of good faith required of a Chapter 11 plan, but the approach taken in *Travelers Ins. Co. v. Pikes Peak Water Co. (In re Pikes Peak Water Co.),* 779 F.2d 1456 (10th Cir.1985) follows the path taken by other circuits in considering the totality of the circumstances. In *Pikes Peak,* the Court affirmed confirmation of a Chapter 11 plan over a good faith objection. The Court was satisfied that the Bankruptcy Court had considered the totality of the circumstances, including the purposes of the Code and the feasibility of the plan. It stated:

> In finding a lack of good faith, courts have looked to whether the debtor intended to abuse the judicial process and the purposes of the reorganization provi-

sions.... Not confirming the plan for lack of good faith is appropriate particularly when there is no realistic possibility of an effective reorganization and it is evident that the debtor seeks merely to delay or frustrate the legitimate efforts of secured creditors to enforce their rights. However, such is not the case here.

*Pikes Peak,* 779 F.2d at 1460. (citation omitted).

Focus upon the totality of the circumstances is also consistent with the evaluation of good faith of Chapter 13 plans in the Tenth Circuit. *Gier v. Farmers State Bank (In re Gier),* 986 F.2d 1326, 1328 (10th Cir.1993); *Pioneer Bank v. Rasmussen (In re Rasmussen),* 888 F.2d 703, 704 (10th Cir.1989); *Flygare v. Boulden,* 709 F.2d 1344, 1347 (10th Cir.1983); *Mason v. Young (In re Young),* 237 B.R. 791, 798 (10th Cir. BAP 1999). In *Flygare,* the Tenth Circuit Court of Appeals enumerated a non-exhaustive list of factors to be considered in Chapter 13 cases.[59] Although many of the itemized factors are peculiar to Chapter 13, these factors include all three approaches taken in evaluating good faith in Chapter 11.

Borrowing from the good faith analysis of Chapter 11 and Chapter 13, it is easy to conclude that the Court should consider the totality of the circumstances. The factors which a Court should examine in each chapter include: (1) whether a plan comports with the provisions and purpose of the Code and the chapter under which it is proposed, (2) whether a plan is feasible, (3) whether a plan is proposed with hones-

---

**59.** They are: " '(1) the amount of the proposed payments and the amount of the debtor's surplus; (2) the debtor's employment history, ability to earn and likelihood of future increases in income; (3) the probable or expected duration of the plan; (4) the accuracy of the plan's statement of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court; (5) the extent of preferential treatment between classes of creditors; (6) the extent to which secured claims are modified; (7) the type of debt sought to be

discharged and whether any such debt is nondischargeable in Chapter 7; (8) the existence of special circumstances such as inordinate medical expenses; (9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act; (10) the motivation and sincerity of the debtor in seeking Chapter 13 relief; and (11) the burden which the plan's administration would place upon the trustee.' " *In re Gier,* 986 F.2d at 1328, *citing Flygare,* 709 F.2d at 1347–48 (*quoting United States v. Estus (In re Estus),* 695 F.2d 311, 317 (8th Cir.1982)).

ty and sincerity, and (4) whether a plan's terms or the process used to seek its confirmation was fundamentally fair.

■ What does it mean to satisfy the purpose of Chapter 9? This question leads back to the legislative purpose underlying it, which is to allow an insolvent municipality to restructure its debts in order to continue to provide public services. Chapter 9's purpose differs from that of Chapter 11. A Chapter 9 plan must be consistent with the governmental nature and obligations of the Chapter 9 debtor.

■ There is no dispute that the Plan was the result of extensive negotiations among the District and various creditors. As to scheduled pre-petition creditors, the Plan generously promises 100% repayment over 40 years. But that is all that the Plan does. The Plan resembles a business reorganization under Chapter 11 in which CDN, as the post-petition lender, controls the reorganized debtor. In exchange for long-term payment of pre-petition debts, the District transfers control of its taxing and revenue raising powers to CDN and abandons provision of public services. The Plan ignores the District's current and future obligations as a governmental entity and in doing so both unfairly favors a single landowner (CDN) and falls outside the policy and purpose of Chapter 9.

Although there are several landowners within the District who would like to develop, CDN receives preferential treatment on both a short-term and long-term basis.[60] In the short-term, the Plan facilitates CDN's development of Springfield Green by allowing consumption of the District's meager water resources. In addition, the District pays a premium price to CDN to acquire its water and tap rights. In the long-term, the Plan commits all of the District's future revenues over 40 years to pay the Exchange Bonds and gives CDN control over the District's power to raise taxes, charge fees, sell assets and borrow on a secured basis.

CDN's development of Springfield Green depends upon confirmation of the Plan. As CDN's representative candidly testified, CDN needs the District's water to develop. Only after Citywide Bank's lien against the District's water rights is released and CDN transfers water it acquired from RTC, will there be sufficient water to develop Springfield Green. Use of water for Springfield Green will leave little, or nothing, for development of the remaining land in the District.

CDN also receives a short-term benefit in the District's acquisition of water and tap rights at the price of $11,844,529.00. This is triple the amount paid by CDN to RTC for the package of land, water rights, tap rights and promissory notes. To pay this sum, the District will issue CDN approximately $21 million[61] in Exchange Bonds. The sale is not an arms-length transaction; the District may be the only prospective purchaser. Moreover, according to the evidence presented, the purchase price allocated to the water rights exceeds their value by at least seven times and the price allocated to the tap rights exceeds the price the District can charge for them by two and one-half times.

The long-term benefits to CDN are even more dramatic. The RTC package of land, water rights, tap rights and the promissory notes cost CDN approximately $4.3 million. CDN's maximum cost to pay to Classes 1, 2 and 7 is $1.96 million and the maximum payment to claim holders in Class 4 (if all cash out) will be approxi-

---

**60.** One cannot escape the significance of CDN's involvement in this case. It has provided all funding for professionals serving the District and has paid certain of the District's pre- and post-petition obligations. CDN calls itself a plan proponent and has participated in virtually every hearing held in this case. Indeed, CDN presented a significant part of

the District's case at the confirmation hearing.

**61.** The water/taps note inexplicably jumps from $11,844,529.00 to $20,997,156.09 in Exchange Bonds. Exhibit L to the Third Revised Disclosure Statement.

mately $1.7 million. This represents an investment by CDN of approximately $8 million. For this, CDN will receive a total of approximately $163 million in Exchange Bonds. If the Development Projections are correct, over a 40–year period the District will pay CDN more than $1 billion in principal and interest. Without taking into account that the Exchange Bond interest is tax-free to CDN, this represents a return on CDN's investment of over 12,500%, at an annualized rate of 312.5%. In addition, CDN can market its land.

Favorable treatment of CDN, by itself, might not run afoul of the good faith standard. But these profits are being funded by using the taxing power of a governmental entity without consideration of the entity's obligations to provide future public services in accordance with its Service Plan. As noted earlier, no expenses for future services or infrastructure have been projected and all projected revenues are devoted to bond repayment. Likely, the District will be unable to raise future revenues from other sources because the Exchange Bonds constitute a first lien and under the Plan Funder Agreement, CDN holds a veto power.

It is not necessary to determine whether CDN's control of the District's future revenue-raising function violates Colorado law. It is sufficient to observe that the Plan and Plan Funder Agreement effectively strip the District of any public function and encumber the District's future revenue to pay past debt and profit to CDN. Chapter 9 was not intended for this purpose.

The parties most adversely impacted by the Plan are the remaining landowners whose interests will be burdened by higher taxes [62] and who will be required to fund all future infrastructure costs necessary for development without any possibility of recompense by the District. For them, the District's bond raising, tax collecting and service providing functions will be extinguished. For the increase in the Dis-

trict's debt load from $58 million to $194 million upon confirmation (and up to $560 million in year 27), and the increase in mill levy from 21.45 to 37, only landowners who are also creditors receiving Exchange Bonds will realize any future benefit. If the Plan is confirmed, the sole future function of the District will be to collect taxes from the landowners to pay the Exchange Bonds.

Considering the totality of the circumstances, the Court concludes that the Plan has not been proposed in good faith. It is not feasible. Its terms unfairly benefit one landowner to the detriment of all others. Most importantly, however, its structure and purpose is inconsistent with the purposes of Chapter 9. It is an attempt to harness a governmental entity's taxing power for private profit.

## V. CONCLUSION

In its closing, counsel for the District argued that the Plan "is not a development plan." This sums up the reasons why it cannot be confirmed. The purpose and function of the District is to facilitate and support development. Development of the land in the District is essential to generate revenues to repay debt. In the development process and thereafter, the District has public obligations. The Plan does not address development practicalities and the District's continuing governmental obligations. As a result, it is not proposed in good faith, conditions precedent to its confirmation are unsatisfied and it is not feasible. Confirmation of the District's Third Amended Plan for Adjustment of Debts must be denied because the requirements of 11 U.S.C. § 943(b)(1), (2) and (7) are unsatisfied.

**IT IS THEREFORE ORDERED** that:

1. The Objections of the Town of Morrison, City of Lakewood and Westwind LLC are **SUSTAINED.**

---

**62.** Due to different assessment rates for commercial and residential property, the tax bur-

den on commercial landowners will always be greater than that borne by residential owners.

2. Confirmation of the District's Third Amended Plan for Adjustment of Debts is **DENIED.**